[Civil No. 2998. Filed April 30, 1931.]

[298 Pac. 634.]

HELEN KING, JACK EDWARD KING, VINCENT V. KING, FRANK E. KING, MYRTLE KING, and MARGARET KING, Petitioners, v. ALABAM'S FREIGHT COMPANY, a Corporation, Defendant Employer; THE INDUSTRIAL COMMISSION OF ARIZONA, Defendant Insurance Carrier, and R. B. SIMS, BURT H. CLINGAN and WILLIAM E. HUNTER, Members of the Industrial Commission of Arizona, Respondents.

Mr. H. S. McCluskey, for Petitioners.

Mr. Edward J. Flanigan and Mr. Terrence A. Carson, for Respondents.

McALISTER, C. J.—This is a proceeding in *certiorari* by Helen King and her five minor children to review an order of the Industrial Commission denying compensation to them for the death of John David King, husband and father, on January 11, 1930, which, it is alleged, was caused by an accident arising out of and in the course of his employment by the Alabam's Freight Company, an Arizona corporation.

Petitioners allege in their claim for compensation that deceased was frozen to death while acting in the course of his employment and in both the original award dated April 14, 1930, and in the one on rehearing under date of July 3, 1930, compensation was denied upon the ground that the evidence was insufficient to establish that he was at the time employed by Alabam's Freight Company, or, if he was, that his death arose out of his employment.

Both in their petition for the writ and their assignments petitioners attack first the procedure followed by the Industrial Commission in arriving at its decision. It appears from the copy of the proceedings certified to this court by the commission that the evidence on rehearing was heard by a referee on May 28, 1930, none of the commissioners themselves being present, and that it had not been transcribed by July 3d when the award was made. This being true petitioners contend that the commission made the findings and the award without hearing the evidence or knowing what it was and, therefore, that its action was unlawful, arbitrary and in excess of its powers. This charge, if true, would demand that

the decision be set aside because the law contemplates that the orders and awards of the commission shall be made after a full consideration by it of all the facts of the case and shall be its deliberate act. In *Johnson* v. *T. B. Stewart Construction Co.*, 37 Ariz. 250, 293 Pac. 20, the following language is used:

"We think it is implicit in the Workmen's Compensation Act that all orders and awards must be the deliberate act of the commission. It is the duty of the commission as a body to consider and deliberate upon the evidence and all of the evidence, whether the issue be one of compensation or one for the protection of the life, health, safety, and welfare of the employees, and bring to bear their best and most conscientious judgment with a view of reaching a just, fair, and equitable conclusion. The commission cannot delegate this imperative duty to any one."

However, the fact that the testimony had not been transcribed when the award was made does not indicate that the commission did not act on it in reaching its decision. The notes of the stenographer were in its possession and were easily read by her, and in the absence of an affirmative showing that it did not have her do this the presumption that it performed its full duty in this respect would necessarily prevail, and especially is this true in view of the fact that a transcript of the evidence is a part of the proceedings which the commission certified in response to the writ of *certiorari* as constituting the record upon which it acted in making its findings and award. The provision that "all testimony shall be taken down by a stenographer" (paragraph 1401, Revised Code of 1928), does not imply that it shall be transcribed in every one of the thousands of cases heard by the commission each year, because to do so would be expensive and serve no useful purpose in a large percentage of the hearings which are mere matters of form and wholly uncontested, but under

paragraphs 1404 and 1452, Revised Code of 1928, it is necessary in those cases in which a party commences in the superior court an action "to set aside, vacate or amend" an order of the commission, or applies to this court "for a writ of *certiorari* to review the lawfulness of the award." There is no statutory requirement that it be done prior to service upon the commission of the proper papers in one of these instances and perhaps no occasion for it up to that time unless the commission feels that a study of the written testimony, not the mere reading of it by the reporter in the hearing of the members thereof, is necessary to advise it fully of the facts.

In their assignments petitioners attack the findings of the commission, their contention being that there is no substantial, competent evidence to support them. The facts which the commission found and acted on in making its award are summarized in finding eleven reading as follows:

"That the evidence is insufficient to establish that at said time the said King was an employee of the Alabam's Freight Company or that he was performing any duty, work or service for Alabam's Freight Company; that his presence on Mingus Mountain on the road between Prescott and Jerome on said 11th day of January was occasioned solely by personal inclination and that his death did not arise out of any work, service or duty which he was performing for any employer, but arose solely out of his permitting himself to become under the influence of intoxicating liquor; that said King was not hired by said Kirkpatrick, or by anybody else, in behalf of said Alabam's Freight Company to go up said mountain at said time, or at any time; and said Kirkpatrick did not possess the authority to hire said King to go up said mountain on said date in behalf of said Alabam's Freight Company."

If the evidence sustains this finding there can, of course, be no question of the correctness of the award, because petitioners are not entitled to com-

pensation unless the deceased at the time of his death was an employee of the Alabam's Freight Company and the accident resulting therein arose out of his employment, and if he was not employed by Kirkpatrick in behalf of that company to make the trip up Mingus Mountain he was not an employee thereof and if his death was due solely to voluntary intoxication it did not arise out of his employment. To determine the correctness of this contention it is necessary to state briefly the facts.

John David King, the deceased, had been regularly employed by the Black Canyon Stage Company as a stage driver between Jerome and Prescott, Arizona, for a year prior to January 11, 1930, but on that day was directed by his employer not to make the trip to Prescott because the weather was very stormy and the road so deeply covered with snow that it was impassable. His services for the Black Canyon Stage Company were paid for by the day but he received nothing from it for January 11, 1930.

For a number of months prior to January, 1930, the Alabam's Freight Company had operated on regular, daily schedule two trucks between Phoenix and Jerome, Arizona. Both trucks left Phoenix about 7:00 P. M. each day and arrived in Jerome the following morning, one at 6:00 A. M. and the other about two hours later. On the evening of January 10, 1930, they started from Phoenix according to schedule carrying freight and perishables but stalled at Congress Junction, so their drivers shipped the perishables from there by express and the rest of the load by freight and wired the company's agent in Jerome, Timothy Kirkpatrick, that they were doing this but the telegram was not received by him at all, or by anyone else in Jerome until Monday, the thirteenth. Unaware of the fact that these trucks had not gone beyond Congress Junction and

thinking some hours after the time for their arrival on January 11th had passed that they had stalled in the storm on Mingus Mountain Kirkpatrick began to make preparations to go up the road toward Prescott to render them whatever aid he could.

According to the record he began preparing for the trip by looking for a pair of chains for the front wheels of the Ford truck in which "he was going up the hill to break the road in." Between 11:00 and 11:30 that morning he told Allen McDonald, an employee of the Alabam's Freight Company who had been hired by Kirkpatrick as a truck driver around Jerome three months prior thereto, that he was doing this and that "he would have to get an experienced man·if he went up there—he wanted a man that was experienced to the road." Replying to the question, "What was his (Kirkpatrick's) capacity there?" McDonald said:

"In case a truck would be stuck in any way they would either call Prescott or Jerome, wherever they could find traffic going to Prescott or Jerome. If we had any stuff on the truck we would take up the little car and pick off the perishable stuff."

About noon he drove up to the Liberty Garage in Jerome looking for the chains and Fred Blakeslee, an employee there, testified as follows concerning the conversation between them:

"He had a set on the rear and wanted a set for the front. I didn't have them in stock and I called our garage at Cottonwood to see if they had them and they didn't, and I asked him why he wanted chains on the front wheels and he said he was going over the mountain to get one of their trucks that was stalled over there and asked me if I knew anyone he could get to go with him. I asked him what was the matter with McDonald and he said he had to make a trip to the valley and that he would rather have someone who had had more experience with the mountain."

In reply to the question, "Did he give any reason why he wanted chains for the front wheels?" he said, "Well, yes. The mountain was in pretty bad shape—it was hard to stay on the road—he said he couldn't stay on the road unless he had chains on all four wheels." The witness stated further that the storm was not a customary but an unusual one for that neighborhood.

Mrs. Helen King, wife of the deceased, testified that he came home at noon that day riding in the car with Kirkpatrick and told her that he could not go out on the Black Canyon Stage, but that he had met Kirkpatrick, the agent for Alabam's Freight Company, and he had hired him (King) for that day to go up the mountain for a truck that was stalled. He told her further that Kirkpatrick wanted someone he could depend on and that he might be gone in the night. In reply to the question, "Did you suggest to him anything with reference to going out?" she answered, "Yes, I didn't want him to go but he said 'you know how bad we need the money' and he told me not to worry about him."

Mrs. Daisy Dickie, who has a store in the same room in which the Alabam's Freight Company maintains its office in Jerome, the two being separated only by chicken wire and shelving, testified that she saw Kirkpatrick frequently that day up to the time he left, which was between 1:00 and 2:00 o'clock and that he said that he had to get some chains for his front tires and someone to stay with his wife. She heard some men to whom he was talking say that he was going up over the mountains and in reply to the question, "Did he say why he was going up the mountain?" she answered, "He never told me why, he mentioned some trucks were stalled or something like that, but I wouldn't say for sure. It was just talk you would overhear. I wasn't paying any attention to it so I couldn't say." She did not see

King but talked to him a little after noon over the phone and when asked, "What was the circumstance of your conversation?" replied: "Well, he called up from the Post Office Cigar Store. When Alabam was out I answered the phone, and he asked: 'Is Kirkpatrick there? I says: 'No,' he said 'This is Dave talking.' I says: 'Dave who?' and he says: 'Dave King. Will you tell Kirk I am up to the Post-Office Cigar Store and I am ready any time?' So of course I told Kirk when he came in. I says: 'I suppose you know about.' He said, 'Yes.' So that was all that was said."

W. M. Scott, an undertaker, saw Kirkpatrick between 12 and 1 o'clock that day when he delivered a small stove to his (Scott's) place of business for the Alabam's Freight Company. He testified:

"I paid him the freight and got kidding him about a big heater we had coming in and asked him where it was and he told me it was somewhere on a truck between Prescott and Jerome and that he was going up as soon as he had finished his deliveries to see if he could find it."

As he was leaving King came around the corner and got in the truck with him and they drove away.

About two miles out they came across Harry Amster, an automobile dealer of Jerome, who had left town around 3:00 P. M. and was taking moving pictures of a new Chevrolet car in which he had ridden out. They stopped to talk to him about 3:30 and he took a picture of them and their Ford truck in the falling snow. From there they went two or three miles further up the road to what is known as the first summit and there helped push a Buick and Ford out of the way of other cars. To the question, "Did they say what they were doing up the road?" he answered, "They said they were going to break the road through to the top. That is the last thing they told us." And to the query, "They didn't say any-

thing about going to get a mail car?'' he replied, ''No, it was the general thought they were going to get a truck and we later discussed it and we discovered that the truck we understood was the car there on the first summit.'' He testified, however, that this was a mistake, that King and Kirkpatrick were not after the particular truck he and the others there thought they were.

They spent about an hour at this point and just before starting from there toward Prescott were given a light lunch and coffee by A. C. Boucher, a Casa Grande fig farms salesman, his sister and her husband, who were camped there. It was almost dark and Boucher and those with him tried to persuade them not to attempt to go further because a number of cars from Jerome had attempted to go through but had been compelled to return, and the snow was then several feet deep in drifts and as many inches on the level and was still falling, but they went on notwithstanding, stating that they knew the condition of the country, had never seen the time they could not get through and thought they could make it all right. They stated further, according to Boucher's testimony, that it was very important that they get over there and get the mail which seemed to be delayed that day and that the ''mail truck was stalled on the other side of the mountain and they had to get the mail and the papers.''

The following day some parties from Jerome came across their truck about a half mile toward Prescott from this first summit standing right side up facing the road and only a few feet from it. A mile or so beyond the truck the frozen bodies of Kirkpatrick and King were found about 200 yards from each other. Kirkpatrick, who was nearer the truck, was six or eight feet from the road, almost covered with snow and lying on his back, one hand on his breast and the other extended by his side. His army over-

coat was lying up against the bank and there was an extra pair of overalls about ten feet from his body. King was twenty or twenty-five feet from the road on a bed of pine boughs lying on his right side, his legs drawn up, one hand on his head and the other across his body. Burnt papers, a flashlight and a milk bottle were close to his side.

It is very clear from the foregoing that several hours after the trucks were due in Jerome, Kirkpatrick came to the conclusion that they were stalled in the snow on the mountains, that they needed help and that it was his duty to go to them and assist in any way he could, and it appears that it was his purpose to do this "by breaking the road" and perhaps by relieving them of part of their load. It was his custom, according to McDonald, when a truck was stuck to go up in a small one and take off the perishables. It is contended, however, that their statement to Boucher, that they had to get the mail, shows that their purpose was not to aid the trucks of the Alabam's Freight Company, because they did not carry mail, but Boucher stated that they said they had to get "the mail and the papers," and the president of the Alabam's Freight Company testified that its trucks carried newspapers at that time. Hence, it is only fair to assume that by the word "mail," as used by them under the circumstances, they meant what the word frequently signifies, "newspapers," because there is nothing in the entire record even intimating that they went up the mountain for any purpose other than to aid the trucks of Kirkpatrick's employer. The Black Canyon Stage Company, for which King had been driving between Prescott and Jerome over this road for a year, did not carry mail and besides King had been instructed by his employer not to make the trip that day but keep the busses in the garage.

It is equally clear that Kirkpatrick employed King to go with him. He wanted someone familiar with the road and King met this requirement, and, besides, was not employed that day by the Black Canyon Stage Company and received no *per diem* from it. He needed the money, however, for he had a wife and five children under seven years of age wholly dependent upon his earnings for support, and the entire record points to the fact that this was his sole reason for undertaking the trip. The only sense, it occurs to us, in which it may be said that his presence on Mingus Mountain that day was occasioned by his "personal inclination" is that he was there willingly because that was the only way open to him of earning something that day for his family.

It is contended, however, that even though Kirkpatrick did in fact employ King he had no authority to do so and, therefore, that King did not become an employee of the Alabam's Freight Company. Kirkpatrick was the agent of this company in Jerome and it was his duty to do what was necessary to keep things going in that vicinity. Three months before he had employed Allen McDonald, who was still with the company, as a truck driver around Jerome. He had the right, the president of the company testified, to hire someone to help him unload heavy stuff "and if a truck was broken down he would have authority to get whatever assistance he would need to get it in." Nothing more than this statement is needed to show that he was acting within the scope of his authority in hiring King to go with him a few miles out of Jerome to aid the drivers of his employer's trucks which he felt sure were stalled in the snow. It is true he was mistaken as to the trucks being there but this did not affect the situation in view of the fact that he did not know they had not gone beyond Congress Junction the night before and there is nothing in the record showing that he knew how

far toward Phoenix the snow had fallen or that the road was in such condition that it was impossible or even difficult for them to reach Mingus Mountain over it. It was, as he viewed it, an emergency and under the circumstances it cannot be said that he went further than the facts as he saw them permitted him to go in his effort to care for his employer's business.

It is urged by respondents, however, that even though King was in the employ of the Alabam's Freight Company his death was not caused by an accident arising out of and in the course of his employment but was the result of a meteorological peril, namely, a severe snowstorm which caused him to lose his life from freezing. They base this contention upon the general proposition that compensation acts do not "authorize an award in case of injury or death from a peril which is common to all mankind, or to which the public at large is exposed" and cite in its support 28 R. C. L. 804; *Netherton* v. *Lightning Delivery Co.*, 32 Ariz. 350, 258 Pac. 306; *Consumers' Co.* v. *Industrial Commission*, 324 Ill. 152, 53 A. L. R. 1079, 154 N. E. 423; *Hagrove* v. *Arnold Const. Co.*, 229 Mich. 678, 40 A. L. R. 398, 202 N. W. 918.

This principle, however, instead of defeating sustains the view that King's death arose out of his employment because Kirkpatrick hired him for the specific purpose of venturing into and battling the storm to carry aid to fellow-employees who were in charge of trucks thought to be stalled in the snow and themselves in distress and need of help  The very nature of the employment demanded that he expose himself to perils to which the public would not expose itself and he was doing this not only when the Ford truck in which he and Kirkpatrick were riding left the road and slid "seven or eight feet down from" it, but also when, following that accident, they walked

on in the raging storm for more than a mile hoping to find the stalled trucks, or a place of refuge at the service station on the second summit which was only a mile from where they became so weak and exhausted they lay down in the snow and died.

A view of their bodies the next day together with the evidence presented to it led the coroner's jury to return a verdict of "death from freezing" and under the authorities "death by accident arising out of and in the course of his employment" is established when the facts show that the employee was "more exposed to the risk of injury from freezing than the generality of workers and that the added risk was because of the character of his employment." *State* v. *District Court*, 138 Minn. 260, L. R. A. 1918F 921, 164 N. W. 917.

The Commission found, however, that King's death resulted solely from intoxication, the language of finding number nine being as follows:

"That the evidence indicates that the action of said King in lying down in said snow in such a manner.at said time was due to the fact that he had imbibed an excessive amount of whiskey and had so benumbed his faculties thereby that he was unable to properly take care of himself, with the result that he was frozen to death while lying or sleeping on said pine boughs on the snow."

It appears from the testimony of Thomas M. Miller that King was drinking, or as he put it "was drunk," a short while before leaving Jerome for the trip and that he then had a quart milk bottle full of whisky, opened it with his knife at Buck Barnes' garage, gave Miller and the crowd there a drink and took one himself but at no other time had Miller ever seen him drinking. Soon after this King and Kirkpatrick left Jerome for the mountain and two miles out came across Harry Amster with his moving picture machine. They offered him a drink from a

milk bottle about half full but he did not take any nor did he see them do so, though he was with them about forty or fifty minutes altogether. He knew both men and testified that neither of them showed any indications of being under the influence of liquor up there; and Boucher, who gave them lunch and coffee at the summit after they had worked about thirty minutes helping to move the two cars, said he saw no "evidence of there being any drinking."

These facts disclose that regardless of his condition before leaving Jerome he was not intoxicated when he left the summit and was last seen alive by anyone except Kirkpatrick, and whether after that he drank at all or, if so, enough to produce intoxication no one can say. It is claimed, however, that the empty bottle by his side and his actions in lying down in the snow as he did furnish ample basis for holding that he imbibed so excessively as to benumb his faculties, but the evidence nowhere discloses that the bottle then contained sufficient whisky to bring about this result; and besides, the fact that he pulled pine boughs from the trees near by to make his bed and that burned papers were found lying about him showed that he was following the instincts of a freezing rather than those of an intoxicated man. One whose faculties are so deadened from intoxication as to render him unable to take care of himself would, the testimony of Dr. Sweek discloses, make no effort to save or help himself but merely drop or fall to the ground. If, however, he did drink liquor excessively at that time he evidently did so thinking, as many people do and Dr. Sweek testified to be true, that it would temporarily stimulate and enable him to make the best of the desperate situation in which he was placed. And this being true, he would not be subject to the charge that he had abandoned his employment, and in no other way could the fact that he was intoxicated bar the right of his dependents to compensation.

It should be kept in mind that the Compensation Act of this state, unlike that of nearly two-thirds of the states of the Union, does not make intoxication, or wilful misconduct which some authorities say includes intoxication, any more than it does careless or negligent acts, a bar to compensation. It provides, sections 1421 and 1426, Revised Code of 1928, that ''every employee . . . who is injured, and the dependents of every such employee who is killed, by accident arising out of and in the course of his employment, wheresoever such injury has occurred, *unless purposely self-inflicted,* shall be entitled to receive . . . such compensation.'' The only noncompensable injury in this state, therefore, is one purposely self-inflicted by the workman and under no condition can intoxication come within this class, unless it is brought about for the purpose of producing an injury or death, or, in other words, with the aim of committing suicide or doing himself serious bodily harm. However, any employee, who drinks intoxicating liquor to such an extent that he can no longer follow his employment, abandons it and is not entitled to compensation for an injury received while in that condition because in that event the accident causing the injury would not arise out of and in the course of his employment.

The record, as we view it, shows conclusively that Kirkpatrick as the agent of the Alabam's Freight Company employed King to make the trip to Mingus Mountain, that in doing so he acted within the scope of his authority, that the accident resulting in his death, freezing, arose out of and in the course of his employment and was not due to intoxication.

The award denying compensation is set aside.

ROSS and LOCKWOOD, JJ., concur.