418 P.2d 602

Richard C. POWELL, Petitioner,

v.

The INDUSTRIAL COMMISSION of Arizona
and Inspiration Consolidated Copper
Company, Respondents.

INSPIRATION CONSOLIDATED COPPER
COMPANY, a corporation, Petitioner,

v.

Richard C. POWELL and the Industrial
Commission of Arizona, Respondents.

Nos. I CA–IC 100, 101.

Court of Appeals of Arizona.

Oct. 10, 1966.

Review Granted Dec. 28, 1966.

Minne & Sorenson, by A. D. Ward, Phoenix, for petitioner Powell.

Robert K. Park, Chief Counsel, by Glen D. Webster, Phoenix, for respondent Industrial Commission of Arizona.

G. H. Ladendorff, Phoenix, for respondent Inspiration Consolidated Copper Company.

CAMERON, Judge.

On 19 October, 1965, the Industrial Commission of Arizona issued its "Decision Upon Rehearing and Findings and Award for Unscheduled Permanent Partial Disability". Both the employer, Inspiration Consolidated Copper Company, and the claimant, Richard C. Powell, petitioned this Court for a writ of certiorari to review the lawfulness of said award. The matters were consolidated

for the purposes of review upon stipulation of counsel.

We are called upon to determine whether the evidence properly before the Commission reasonably supports the finding that:

One, the claimant is entitled to compensation for partial temporary disability from 7 November, 1964, through 5 April, 1965, and

Two, that the claimant has suffered no loss of earning capacity as a result of the industrial injury of 8 September, 1963.

The facts necessary for a determination of this matter are as follows: Claimant, Richard C. Powell, age 29, was a tank house shift foreman for the Inspiration Consolidated Copper Company, when, on 8 September, 1963, he slipped and fell into an area saturated with sulphuric acid. He testified that he set down hard in the acid sludge and that he began to feel a burning sensation in his buttocks and ankles. He managed to telephone for help and then collapsed. The men who responded first turned a water hose on the claimant in order to rinse the acid from claimant's body. He was then placed on a stretcher, but the acid on his body ate through the material on the stretcher and he again fell to the floor.

Claimant was hospitalized for surgical debridement of the burned area and skin grafts, and the file indicates that at least four operations were performed, the first being on 16 September, 1963. In January of 1964, Dr. Ergenbright also diagnosed a "minimal compression fracture" at "L-4" in the back.

Claimant returned to "light work" at his old job in March of 1964. He complained of pain in his back and legs, and of pain and difficulty in attempting to perform the walking and climbing in connection with his employment. The company doctor later ordered him away from the tank house where he had been working because the sulphuric acid fumes were causing the skin grafts to break down. Claimant was transferred to the crusher as a trainee, and

claimant testified that his duties were primarily standing and walking. He found it necessary to sit in the office by the telephone where he was available, but able to rest. He rested and even slept some on the job, because, as he testified, he was in a great deal of pain and unable to sleep well at night.

Claimant's employment with Inspiration was terminated in November, 1964. Inspiration alleges that he would not perform the work the medical consultants deemed him physically capable of doing. Claimant alleges that he was not physically capable of performing these duties.

Following his discharge from Inspiration, Powell sought work with a number of potential employers and also registered with the State Employment Commission in his area. In January of 1965, he found employment as the manager of a cemetery. He left this employment due to a dispute with the manager, and found work as a part time service station employee at $1.25 per hour.

■ After considerable activity including medical consultation as ordered by the Commission, a formal hearing was held 19 August, 1965. The claimant, Richard C. Powell, and the employer, Inspiration Consolidated Copper Company, were both represented by counsel. At the beginning of the hearing, claimant's attorney made the following objection:

"In connection with the file being considered part of the evidence, I'd like the record to show that the claimant objects to any opinions given by any of the physicians, some of which was noted in the summary rejecting an opinion by the doctor as to the capability of this particular claimant to do any particular kind of work, such opinion evidence being clearly incompetent."

This limited objection having been made, the Referee and the Commission may not consider these opinions as reflected in the file and we will not consider them on appeal. Other matters in the file not having been

objected to may be considered by the Commission and by this Court on appeal. Jones v. Industrial Commission, 1 Ariz.App. 218, 401 P.2d 172 (1965), Avenente v. Smouse, 1 Ariz.App. 24, 398 P.2d 932 (1965). This would be in addition to the general rule that the Commission may not base a decision that there has been no loss of earning capacity on medical testimony. Moore v. Industrial Commission, 2 Ariz.App. 143, 406 P.2d 861 (1965). The only medical witness called at the hearing was I. E. Harris, M.D., Chief Surgeon of the Miami Inspiration Hospital, located at Miami, Arizona. Dr. Harris testified that, in addition to his medical qualifications, he was familiar with the working conditions under which claimant worked and what would be required of claimant in the performance of his duties. Being thus qualified to express his opinion concerning claimant's ability to perform the work required of claimant on the job, and being present and subject to cross-examination, his testimony was properly received by the Referee at the hearing. Hoffman v. Brophy, 61 Ariz. 307, 149 P.2d 160 (1944).

After the formal hearing, the Industrial Commission issued its "Decision Upon Rehearing and Findings and Award for Unscheduled Permanent Partial Disability". After further pleadings and order denying rehearing by the Commission, both the employer and the claimant petition this Court for a writ of certiorari to review the lawfulness of said decision. The employer objects to Finding Number 6 and the claimant objects to Finding Number 9 of the findings and award of the Commission.

### FINDING NUMBER 6

█ Finding Number 6 of the Industrial · Commission reads as follows:

"6. That said applicant is entitled to compensation for total temporary disability from September 8, 1963, through March 15, 1964, in the sum of $2,830.65; and compensation for partial temporary disability from November 7, 1964, through April 5, 1965, in the sum of $1,440.52, or the total sum of $4,271.17."

The employer, Inspiration Consolidated Copper Company, objects to this finding as it relates to the award of compensation for partial temporary disability from 7 November, 1964, when claimant was discharged by Inspiration, to 5 April, 1965, the date the Commission found the condition of the claimant had become stationary (with 10% general physical functional disability).

Inspiration contends that this finding by the Commission is not supported by the evidence. With this contention we cannot agree. The testimony of the claimant's fellow workmen is more than ample from which the Commission could find that claimant was unable to adequately perform the work assigned by Inspiration and the evidence reasonably supports the Commission's finding that the 10% partial temporary disability was a legal result of claimant's industrial injury. Finding Number 6 being reasonably supported by the evidence, we must sustain it on review. Eck v. Industrial Commission, 1 Ariz.App. 505, 405 P.2d 296 (1965), Donaldson v. Industrial Commission, 2 Ariz.App. 172, 407 P.2d 111 (1965)

### FINDING NUMBER 9

The Commission further found as follows:

"9. This Commission finds that said applicant has the physical and mental capacity to perform the duties required of him in the occupation in which he was employed at the time of injury; so has therefore suffered no loss of earning capacity as a result of his injury of September 8, 1963, nor the disability resulting therefrom and is not entitled to an award therefor under the provisions of A.R.S., Section 23–1044 C & D, 1956."

This was contrary to the report of the Referee who found:

"1. That as a result of his physical disability, claimant is unable to satisfactorily perform the duties of his regular occupation."

"3. That the claimant is capable of working regularly as a service station attendant to the extent that he may reasonably be expected to earn the sum of $324.75 per month."

And reached the conclusion:

"1. That claimant has a 52.37% loss of earning capacity and is entitled to compensation in the sum of $196.36 per month payable from and after April 6, 1965."

The file does not indicate that the Commission received any testimony or evidence other than the same record that is before this Court.

The tesimony is conflicting. The testimony is more than ample to support the findings of the Referee. The testimony is also sufficient from which the Commission might reach the conclusion contained in paragraph 9 overruling the findings of the Referee on this point.

■ Generally, it may be said that although the appellate court may feel that the weight of the evidence as a whole is against the findings of the Industrial Commission, the appellate court may not disturb those findings if they are supported by sufficient, legally competent evidence. The reasons for this viewpoint are quite sound, and based in the rules governing appeals from the trial court. As has been stated:

"It was the trial court's function, and not ours, to judge the credibility of the witnesses and we hold that we are bound by its decision in this regard." Tonelson v. Haines, 2 Ariz.App. 127, 129, 406 P.2d 845, 847 (1965).

When considering appeals from the trial court, this Court will give due regard to the opportunity that the trial court had to observe the demeanor of the witnesses and to judge the credibility of the testimony.

■ The situation, however, is quite different when, as here, we are asked to review a decision of the Commission where the testimony was taken, not by the Commission, but by a referee appointed by the Industrial Commission. It is the referee who hears the testimony, observes the demeanor of the petitioner, and is best able to judge the reliability and credibility of the witnesses who have testified at the hearing. Absent testimony before them, the Industrial Commission in reviewing the hearings before the referee, is in the same position as an appellate court in that both the Commission and the appellate court must evaluate the evidence from the record presented.

Our Supreme Court earlier commented on this procedure as follows:

"The petitioners complain of the failure of the Commission itself to hear the testimony and rule directly upon the admissibility of evidence. At the oral argument it developed that the Commission rarely, if ever, conducts a hearing, leaving it invariably to a referee to take the testimony and then they review the 'cold record' and make findings upon which the award is based. Though they have the power to follow this procedure, we seriously doubt whether the legislature contemplated that this should be the rule rather than the exception. It would seem that the Commission, as the ultimate trier of the facts is handicapping itself in these comparatively few contested cases by not observing first hand the character of the witnesses, their appearance and deportment upon the stand and the many 'intangible' things occurring in a hearing that perforce do not appear in the printed record." Aluminum Company of America v. Industrial Commission, 61 Ariz. 520, 531, 152 P.2d 297, 301 (1944).

Since this statement by our Supreme Court, the work load of the Industrial Commission has greatly increased and this Court is aware that most, if not all, Industrial Commission hearings are now conducted by referees appointed by the Commission. The record before this Court in the instant case reflects that the referee made a report to the Commission and the Commission, after the filing of objections to the report by both Inspiration and the claimant, then acted on the record presented. In this situation and

following this procedure, the importance of the referee to a fair and just determination of the issues cannot be over-emphasized. It is the referee who hears the witnesses, rules on the admission of evidence, and forms the impressions from the demeanor of the witnesses which the cold record on review cannot indicate.

Realizing the importance of the referee in the Commission's procedure, this Court has not hesitated to comment and to set aside awards when it felt that the referee did not conduct the hearing so as to allow the parties the fair and impartial hearing to which all parties before the Commission are entitled. Avenente v. Smouse, supra, Lewis v. Industrial Commission, 2 Ariz. App. 522, 410 P.2d 144 (1966). Our legislature probably did not, at first, contemplate that the Commission would have to rely on an extensive referee system (Aluminum Company of America v. Industrial Commission, supra). Today, however, in order for the Commission to properly and adequately operate under the existing case load of claims and to provide the

> " * * * just and humane compensation law in the State of Arizona, for the relief and protection of such workmen, their widows, children or dependants, as defined by law, from the burdensome, expensive and litigious remedies for injuries * * *." Article 18, Section 8, Constitution of Arizona, 1 A.R.S.,

which the law requires, the Commission must rely on a system of referees or hearing officers to receive evidence and rule upon its admissibility. It is then apparent that the system of referees is fundamental to the Commission's fact finding process, and the successful functioning of the Commission in this regard will depend, in a large part, upon the fair and impartial hearing the referee must conduct, and the judicial temperament of the referee. Salmi v. Industrial Commission, 3 Ariz.App. 411, 415 P.2d 126 (1966), review denied 27 September, 1966.

In this case, we are called upon to determine whether the Commission was correct in setting aside the finding of fact made by the Referee after the hearing. In determining this question, we have before us the same cold record that was before the Commission when they set aside the finding of fact made by the Referee.

Under these conditions we do not feel it illogical or unjust that we substitute our analysis of the record for that of the Commission in determining whether Commission correctly set aside the factual determination of the Referee. We therefore hold that this Court, in reviewing the actions of the Industrial Commission in reversing a fact determination made by a Commission referee after a hearing, will feel free to set aside the decision of the Commission even though supported by a portion of the evidence when, in our opinion, reviewing the same cold record that was before the Commission, we feel the weight of the evidence supports the finding of the referee.

We are aware that this position is a minority view in the United States. A recent Pennsylvania case has stated what appears to be the majority rule—that the referee is only an agent of the Commission and the board or commission is the final arbiter of the facts. McGowan v. Upper Darby Pet Shop, 53 Del.Co. 209, Penn. Common Pleas (1965). The view that the referee is merely the agent of the Commission and that this Court must uphold the Commission even when we believe they have erroneously set aside a decision of the referee who heard the testimony and judged the credibility of the witnesses, is not, in our opinion, the better view. A different view is stated by the Florida court based upon the Florida statutes:

> "It is our view that under existing law the full Commission when reviewing a matter which has been heard by a deputy commissioner should give to his findings of facts about the same weight that this Court is required to give the findings of facts made by a Chancellor, and the full

Commission should not reverse the findings of facts made by a deputy commissioner unless it is made to appear that those findings of facts are not sustained by competent substantial evidence." United States Casualty Company v. Maryland Casualty Company, 55 So.2d 741, 745 (Fla.1951).

See also Crowell v. Messana Contractors, 180 So.2d 329 (Fla.1965). Although our statute and case law will not allow us to go this far, we believe it to be a better and more realistic view of the situation. The Florida cases not only recognize the importance of the referees in the hearings of the many cases before the Commission, but also recognize that it is physically impossible for the Commission to hear or adequately review each and every case before it.

■ There is another reason why we feel that the reports of the referees should be given special consideration by this Court when reviewing the decisions of the Commission itself. Rule 41.3 of the Rules of Procedure before the Industrial Commission of Arizona provides:

"The referee conducting the hearing shall write a referee's report embodying findings of fact, conclusions of law and a brief statement of reasons for his findings and conclusions, and shall transmit it to the Commission with the transcript of the testimony, claims file and exhibits. He shall cause a copy of the referee's report to be served upon the Chief Counsel and all interested parties. Within such time as designated by the referee, after being served with a copy of the referee's report, any interested party including the Chief Counsel may file written objections thereto with the Commission and serve copies of such objections upon the Chief Counsel and the other interested parties. The Commission, after deliberating on all of the evidence and written objections to the referee's report, may adopt the referee's report or may ·modify it or may reject it in whole

or in part or may receive further evidence, or may recommit the matter to a referee with instructions."

This rule is similar in language to Rules 53(g) and 53(h) of the Rules of Civil Procedure, 16 A.R.S., and made pursuant to the provision of the Arizona Workmen's Compensation Code:

"B. In the discharge of his duties, the agent shall have the inquisitorial powers granted by this chapter to the commission and the same powers with regard to taking testimony as a referee or master appointed by a superior court. The recommendation made by such agent shall be advisory only and shall not preclude taking further evidence or making further investigations." 23–928 subsec. B, A.R.S.

Our Supreme Court in discussing this section has stated:

"In support of the second ground, petitioner takes the position that referees or agents appointed by the commission under authority of sec. 56–912 A.C.A., 1939, should perform their duties in compliance with the rules governing superior court referees and masters, as set forth in * * * [the Arizona Code Annotated] 1939. We cannot agree with this view. Sec. 56–912, supra, giving the commission power to appoint agents or referees, specifically states that such agent shall have the powers 'of an inquisitorial nature, granted herein to the commission and as a referee appointed by a superior court with regard to taking testimony.' Obviously, this applies only to the actual taking of evidence and has no relation to reports of masters mentioned in sections 21–1101 and 21–1107, supra. The superior court master or referee has no inherent power to make reports (citations omitted). * * * Undoubtedly the commission has the power to order the agent or referee taking testimony to make and file a report which would then become a part of the record. But the law does not require it to do so."

Radaca v. United States Smelting R. & M. Company, 62 Ariz. 464, 468, 469, 158 P.2d 540, 541, 542 (1945).

Under this decision of the Arizona Supreme Court, the referee is not required to make a report to the Commission though, as a practical matter under the present procedure, we do not see how it is possible for the referee to act properly without doing so as, indeed, the Commission's Rule 41.3, op. cit., requires. In the instant case, the referee did make a report and in construing federal rules, similar to Arizona's Rules of Civil Procedure 53(g) and (h), the federal courts have given special dignity and consideration to the superior fact finding opportunities of the masters:

"Much labor and thought was given to the matter by an experienced Master, as is amply disclosed by a study of the first report rendered by him. He heard, saw and observed the witnesses and was in a better position to judge of their credibility and the weight to be given their testimony than either the District Court or this court, neither of which has had such an opportunity. To set aside his findings 'unless clearly erroneous' is not only contrary to the rule quoted and the accepted practice, but amounts to a trial de novo by the reviewing court with no assurance that any better or more accurate results could be achieved." Santa Cruz Oil Corporation v. Albright-Nell Companies, 115 F.2d 604, 607, 608, 7th Circuit (1940).

And:

"Where there has been a reference to a master, the master's findings are entitled to special weight because he has seen and heard the witnesses, but they are not given the effect of a verdict by a jury. The language of the rule is that the court shall accept the master's findings unless clearly erroneous. This is manifestly a guide to be followed in the exercise of the discretion vested in the District Judge, not a limitation upon his power." United States v. Twin City Power Company, 248 F.2d 108, 112 (4 Cir., 1957).

Following this line of reasoning we do not feel that the report of the referee was "clearly erroneous", and we hold that the Commission erred by its Finding Number 9 which set aside the fact determination of the Referee.

There is still another reason, however, why the award must be set aside as to Finding Number 9. The testimony indicates that after Inspiration terminated Powell's employment in November, 1964, Powell made diligent efforts to secure other employment, and that after a brief period of time working for a cemetery company he finally secured work as a service station attendant at $1.25 per hour, where he was working at the time of the hearing.

In an attempt to show that the claimant had not suffered a loss of earning capacity as a result of the industrially related 10% physical functional disability, Inspiration obtained the services of an investigator who took pictures of claimant working at the service station. He testified that he was "in the area" for two hours, forty-five minutes and observed Powell during that time from a distance. He stated that he took two rolls of film of Powell's activities, one full, 50 foot reel; and one partial, 30 foot reel over the two hour and forty-five minute period. He testified that he did not take a continuous film of all of Powell's activities during that period, but only recorded selected periods of activity. The film was shown at the hearing. The following took place:

"MR. WARD: Q. It is your testimony that all of the things that are shown on that film were done literally within the time it took to show that film in there a while ago?

"A. No, sir.

"Q. Then the film is speeded up quite considerably, isn't it?

"A. I am not a qualified expert on projectors. I could not tell you how the

speed of a projector or how fast it is supposed to go for a 16 millimeter projector. I don't know this.

"Q. The various things that were shown on this film a few minutes ago that were exposed took more than two or three minutes to perform actually, isn't that true?

"A. Yes, sir, very definitely.

"MR. WARD: I am going to object to the admission of this film on the ground that it does not accurately portray what actually occurred. It is obviously speeded up quite considerably, as a matter of fact, I timed it and it appears to have run not in excess of two minutes, yet the particular events that were shown on there would have taken quite a bit more than two minutes, it would certainly seem to me, and I think it was obvious to all who looked at it that the film was speeded up and in this case this is material and also critical because it makes it appear this Claimant is bouncing around like a three-year-old boy. I therefore object to it as not being a proper portrayal of what actually happened.

"MR. LADENDORFF: Mr. Sandell, we admit that the film is not taken at exactly the same speed that the individual worked. We admit also that the film does not purport to show everything that was observed by the witness. On the other hand, we would like to point out to the Referee there are other actions of the various people shown in the film and permits an analysis or comprehension of what this man was doing and how fast he was doing it as compared with other people in the picture."

"THE REFEREE: The motion will be denied. Exhibit A will be admitted in evidence."

The Referee in his case summary submitted to the Commission, commenting on these movies, pointed out:

"It should be pointed out, however, that the film which was only two minutes in length, should (sic) the claimant only when he was moving, and not during periods when he was resting, and the film depicted the claimant's movements faster than they actually were. (T.R. 307, 308)."

Although we must assume the Commission viewed these films, as well as all other evidence in the file, Wilson v. Wilson, 1 Ariz. App. 77, 399 P.2d 698 (1965), King v. Alabam's Freight Co., 38 Ariz. 205, 298 P. 634 (1931); 40 Ariz. 363, 12 P.2d 294 (1932), we do not know whether the Commission took into consideration the fact that the film was "speeded up" as apparently did the Referee.

The basic principles which govern the admissibility of still pictures, govern the admissibility of motion pictures, and they are not admissible unless the person offering the pictures show they are a true reproduction of the scenes photographed, and are properly authenticated according to the rules of evidence. Because motion pictures are peculiarly susceptible of fabrication, the courts, as a general rule, exercise unusual and extra caution in determining whether motion pictures should be allowed into evidence. While we do not set forth here the various rules necessary for the admission of motion picture film into evidence, we can certainly state that motion picture film that has been "speeded up" in one way or another, so that the image as projected on the screen does not portray the actual speed of the subject, is not admissible; and in the instant case, should not be considered by the Referee or the Commission as evidence; nor will we consider it on appeal. It is difficult to imagine any evidence more damaging to a compensation claimant than the motion pictures as shown, which were taken or projected so as to show the claimant working at a rate of speed different from the speed under which he actually worked when the picture was taken. Because of the highly prejudicial nature of this type of evidence to the claimant, the award as it relates to Finding Number 9 must be set aside.

For the reasons stated, the award in case Number 1 CA–IC 100 (relating to Finding Number 9) is set aside. The award in 1 CA–IC 101 (relating to Finding Number 6) is affirmed.

STEVENS, C. J., and DONOFRIO, J., concur.