IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 14, 2003 Session

## STATE OF TENNESSEE v. WILLIAM E. McCARVER

**Direct Appeal from the Circuit Court for Sequatchie County**
**No. 3608     Buddy D. Perry, Judge**

---

**No. M2002-00123-CCA-R3-CD - Filed September 9, 2003**

---

The defendant was convicted by a Sequatchie County Circuit Court jury of first degree premeditated murder for shooting his wife's boyfriend to death outside a gasoline station and convenience store. Because the State did not seek either the death penalty or life without parole, the trial court automatically sentenced him to life imprisonment in the Department of Correction. In this appeal as of right, the defendant raises essentially three issues: (1) whether the evidence was sufficient to support his conviction; (2) whether the trial court erred in admitting into evidence enhanced versions of the store surveillance videotape of the shooting; and (3) whether the trial court erred in its jury instructions on intentionally and knowingly. Following our review, we conclude that the evidence is sufficient to sustain the defendant's conviction for premeditated murder, the trial court did not err in admitting the videotapes, and any deficiency in the jury instructions constituted harmless error. Accordingly, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and DAVID H. WELLES, JJ., joined.

Leonard "Mike" Caputo, Chattanooga, Tennessee (on appeal); Stephen T. Greer and Thomas A. Greer, Dunlap, Tennessee (at trial), for the appellant, William E. McCarver.

Paul G. Summers, Attorney General and Reporter; Kim R. Helper, Assistant Attorney General; J. Michael Taylor, District Attorney General; and Thomas D. Hembree, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

At approximately 10:20 a.m. on Wednesday, August 14, 1996, the defendant, William E. McCarver, shot and killed his estranged wife's boyfriend, Ricky Jason Harvey, as the victim was

sitting in his pickup truck at the Golden Gallon gasoline station/convenience store in Dunlap waiting for his eight-year-old nephew to return to the vehicle from the store. Following the shooting, the defendant immediately turned himself in at the sheriff's department, stating as he did so that he shot the victim in self-defense after the victim pulled a knife on him. However, although two knives were found on the floorboard of the victim's truck, the defendant was subsequently charged with the premeditated murder of the victim. At trial, the defendant did not dispute that he shot the victim, but instead attempted to show that the shooting occurred in self-defense and/or his medical problems, particularly those associated with the triple heart bypass surgery he had undergone some seven weeks before the shooting, prevented him from forming the requisite intent for a first degree premeditated killing.

## State's Proof

The State's first witness at the defendant's January 21-24, 1998, trial was the victim's sister, Jewell Steele, whose testimony was as follows: The victim was thirty-three years old at the time of his death and employed as a truck driver at RPS in Chattanooga, but had been off work and receiving workers' compensation for about a month due to an injury to his right arm, which required him to wear a sling. The victim was right-handed. He lived in a double-wide trailer on Harvey Road, located in an area in which several family members, including Steele and her parents, had separate homes. The victim owned three vehicles: a red Chevrolet Silverado pickup truck, the vehicle he normally drove; a blue Chevrolet Chevelle, which he had allowed Steele's older son to borrow; and a four-wheel drive, multi-colored Ford pickup truck that "set up high" off the ground, which he used to haul wood and "go mud riding." The victim had been seeing the defendant's estranged wife, Delilah McCarver, for about a year and a half and, six to eight months before his death, had allowed her to move into his home, where they openly lived together.

Steele further testified that approximately four weeks before the shooting, she confronted the defendant outside a restaurant in Dunlap to ask why he had put sugar in the gas tank of the victim's Chevelle, and to tell him not to bother her sixteen-year-old son, who had borrowed the car from the victim. She said the defendant acted as if he did not know what she was talking about and accused her of threatening him. However, he also told her during the course of the conversation that he was not through with the victim yet.

Steele stated that the victim owned a pistol and a shotgun, but she had never seen him carry either in his vehicles. The victim also owned a nonfolding knife which he kept in a scabbard in his glove box. He was not in the habit of carrying a pocketknife or any other kind of knife on his person. The victim's knife was found in its usual place after the shooting, and Steele did not recognize either of the two knives that had been recovered from the truck's floorboard.

Steele acknowledged having reported to the victim the defendant's statement about not being through with the victim yet. She further acknowledged the victim's reaction had been to laugh and boast that he was not afraid of the defendant and would meet him wherever the defendant wanted him to. Steele said her confrontation with the defendant outside the restaurant occurred in the middle

of July. She had heard the defendant had undergone some kind of surgery shortly before the confrontation occurred, but had not known he had had open-heart surgery on June 24. She testified the victim owned a machete, which he usually kept in a toolbox in the back of his Ford pickup truck, but her older son had recently placed it under the vehicle's seat after using it to cut weeds. She said the victim was no longer wearing his arm in a sling at the time of the shooting.

Raymond Stewart, a mechanic, testified he had a telephone conversation with the victim about a transmission on the evening of August 13, 1996. Stewart's wife, Vicky Stewart, testified that the victim, who was driving a large, rough-looking truck and accompanied by a child, dropped a transmission off at her house at approximately 10:00 a.m. on August 14, 1996, at a time when her husband was away from home. She agreed on cross-examination that the transmission looked heavy and that transmissions are generally "hard to move around."

Jeff Turner testified he operated J & J Complete Car Care in Dunlap, which was located approximately three-quarters of a mile from the Golden Gallon on Highway 127. He was acquainted with both the victim and the defendant and with their respective vehicles. The defendant drove a distinctive, 1996 or 1997 model, white Ford extended cab pickup truck. According to Turner, in one of those years, Ford dramatically changed the design on their pickups, and he knew of only two such trucks in Dunlap at the time. He said he was able to distinguish the defendant's truck by the bug deflector across the hood and the front tag which read "Southern Exposure."[1]

Turner testified the victim pulled into his shop on the morning of August 14, 1996, to discuss some automotive repairs he needed on his Chevrolet pickup. The victim was driving his blue Ford four-wheel drive pickup truck at the time and was accompanied by a young boy. During his ten-to fifteen-minute conversation with the victim, Turner saw the defendant, driving his white Ford pickup truck, pull off the highway behind the victim's vehicle and sit for a minute before pulling back out onto the highway and heading north in the direction of the Golden Gallon. The defendant was wearing a cowboy hat, which Turner believed was dark-colored. Approximately four or five minutes later, the victim left, also driving north. Turner said the victim did not see the defendant, and he did not inform the victim of the defendant's presence behind his vehicle. Five to ten minutes after the victim left his shop, Turner saw police cars and an ambulance "go flying by" his business and later learned the victim had been killed.

Turner acknowledged on cross-examination his testimony at the bond hearing had been that the defendant was stopped for only a second behind the victim's vehicle. He conceded traffic might have been busier than usual that day because of the start of the Highway 127 flea market, which brought in people from "Tennessee, Alabama, Georgia, Kentucky," and elsewhere. He further acknowledged he had not been in a position to see a "Southern Exposure" tag on the front of the white Ford pickup, and had told defense counsel at the bond hearing he was not sure it was the defendant he had seen driving the vehicle. He testified on redirect, however, that he remembered

---

[1]Steele also testified she was able to recognize the defendant's white Ford pickup by its "Southern Exposure" tag, the name of a band in which the defendant's son played.

the vehicle's having had a bug deflector across the hood. During recross-examination, which occurred at a later point during the presentation of the State's case in chief, Turner testified that a few minutes after the victim left his shop heading north, he saw another white Ford truck that looked like the defendant's pass his shop, also heading north on Highway 127.

Denise Wiliford testified she was working as a cashier at the B Quick Market on Highway 111 in August of 1996, and knew the defendant as a regular customer. On the morning of August 14, 1996, the defendant came to the store in a white Ford pickup truck and purchased 9.5 gallons of gasoline, which he paid for with his Texaco credit card. Wiliford identified the credit card receipt of the defendant's purchase, which reflected that the purchase was made at 10:16 a.m. She testified she did not know if the credit card machine was calibrated for Eastern or Central Time. She said that sometime after the defendant left the store, someone came into the market to tell her there had been a shooting at the Golden Gallon.

Deanna Sims testified she was the manager of the Golden Gallon service station and convenience store on August 14, 1996, and knew the defendant. She said she was driving through town that morning on her way to pick up a deposit receipt from the bank when she saw the defendant, who was wearing his usual cowboy hat, driving north toward the Golden Gallon in his white Ford pickup truck with its "Southern Exposure" tag. When she returned to the Golden Gallon, the defendant was sitting in his truck parked in the third or fourth parking space in front of the store on the left-hand side, near the propane tanks and diesel pumps. After she had gone inside to the cash register area at the front of the store, Sims saw the defendant back out of his parking spot and pull to pump four at island two, with his truck facing the road. She saw the defendant's door open and assumed he was getting gasoline. At the same time, she noticed a multi-colored, four-wheel drive truck that "stood up off the ground" pulled up to the other side of the same island, at pump three. Between two and five minutes later, Sims was walking from her office toward the front of the store when she heard "two loud booms" in quick succession, coming from outside the store. At that point, "everything sort of went crazy," with one or two people coming into the store and instructing her to call 9-1-1 because someone had been shot.

Sims testified the store had two surveillance cameras, one of which was directed down an aisle toward the front of the store, and the other of which was directed at the front door, but also recorded a portion of the parking lot and gas pump areas outside. Instead of two separate videotapes, the images from the cameras were recorded on a single videotape which showed each separate view in a split screen format. Sims identified the original videotape recorded by the store's surveillance cameras, which she said she had turned over to Investigator Joe Nipper of the Sequatchie County Sheriff's Department. The videotape was subsequently admitted as an exhibit to her testimony and marked as Exhibit 5.

Marian Lance testified she was working as a cashier at the Golden Gallon on August 14, 1996. As she was busy at the cash register that morning, she heard a loud bang, looked outside, and saw a man with white hair and a yellow cowboy hat walk in between two gas pumps to a multi-colored truck parked at pump three and reach his arm almost inside the vehicle. At that point, she

heard a second "bang" and saw the flash of a person inside the vehicle sliding down out of her view behind the dashboard. The man in the cowboy hat then walked back to his white truck and got inside. Next, she noticed a little boy walk to the multi-colored truck, open the door, jump backwards, and begin screaming. As she was going outside to bring the boy into the store, she heard people shouting, "There he goes. There he goes," and looked up to see the white truck headed toward town.

Michael Scoggins testified he was pumping gas at the Golden Gallon when he noticed the victim's four-wheel drive vehicle parked at a gas pump one or two islands over. As he looked at the vehicle, he saw the defendant, whom he described as a man wearing a white cowboy hat, drive up to the pump on the opposite side of the same island at which the victim's vehicle was parked. Scoggins then saw the victim exit the store and walk to his vehicle. The defendant walked to the island and said something Scoggins could not make out, followed by the name "Harvey." Five or six seconds later, Scoggins heard a gunshot. Next, he saw the defendant step up onto the island between the gas pumps and lean toward the victim's vehicle, followed by the sound of another shot. Scoggins estimated the second shot occurred approximately a minute and a half after the first shot.

Scoggins testified he then saw the defendant return to his truck, place something under the seat, get inside, and drive toward town. He said that after he had recorded all but the last letter of the defendant's license plate, he ran to the victim's vehicle, where he saw immediately that it was too late to help the victim. According to his testimony, the victim was lying on his right side on the seat with his right hand in the floorboard and a closed lock-blade knife at his fingertips.[2] Somewhere during that initial interval, as he and his brother-in-law were checking on the victim's condition, he saw a small boy come to the passenger side of the vehicle, look in the open door, and begin screaming.

Scoggins testified on cross-examination that the second shot occurred only a few seconds after the first shot, rather than a minute and a half later; the defendant left not long after the second shot was fired; he did not know if the victim's passenger door was open or closed at the time of the shooting; and he could not tell whether it was the defendant or the victim who uttered the unintelligible word he heard before the defendant said "Harvey."

Scoggins' sister, Tina Sutherland, testified she was inside the store waiting to pay for gasoline when she heard a loud noise like the sound of a car backfiring, followed a few seconds later by another similar sound. Looking outside, she saw her husband getting out of their car with an expression on his face which made her realize something was wrong. When she went to the door, her husband yelled that someone had been shot. She then ran to one of the pump islands, grabbed some paper towels, and ran to the victim's vehicle, where her husband informed her there was no need to attempt CPR. As she was turning away from the vehicle, she noticed a small boy crying. She and another person took the boy into the store, and she telephoned his mother.

---

[2] Although Scoggins testified that the knife was closed, crime scene photographs show that it was, in fact, open.

Tina Sutherland's husband, Jeff Sutherland, testified he was waiting in the car with their four children while his brother-in-law pumped gasoline into their vehicle. As he sat there, he saw the victim, who was carrying a sack, walk from the store to his vehicle and start to get in. At about the same time, the defendant pulled up to the other side of the island in his white truck, got out, and started walking toward the front of his truck. Next, Sutherland heard the sound of a gunshot. When he looked over, he saw the defendant, who appeared to be standing on the island, lean over into the victim's truck and heard a second gunshot. The defendant then returned to his vehicle, appeared to put something "up in his truck," got in, and unhurriedly drove out of the parking lot, headed toward town.

Sutherland testified he did not recall hearing any words exchanged between the defendant and the victim. He said he did not know if the defendant left his truck running when he got out and walked to the victim's vehicle, but he could not remember hearing the sound of the defendant's truck engine starting when the defendant got back inside it after the shooting. Sutherland said he believed he was out of his car and moving toward the victim's vehicle when he saw a small boy walking toward the vehicle from the store. Although he was not positive, he thought the child opened the passenger door of the vehicle and then began screaming, "Uncle, uncle." Sutherland testified it was obvious the victim was dead. On cross-examination, Sutherland acknowledged there was only a slight pause between the two gunshots and that the defendant walked back to his vehicle immediately after the second shot, got in, and left.

The victim's ten-year-old nephew, Jason Steele, testified he was eight years old at the time of the shooting. He said he rode with his uncle to town that morning where his uncle stopped at several places, including "some man's house . . . [t]o drop off something," the bank, "a muffler place," and a "flea market" or "yard sale" next to the Golden Gallon, before driving to the Golden Gallon to pump some gas. After his uncle finished pumping the gas, Jason accompanied him inside the store, got a "Sundrop," which he handed to his uncle, and then went to the bathroom while his uncle went to the cash register. Because he did not see his uncle inside the store when he came out of the bathroom, he started outside. However, before he went out the door, he heard two loud noises outside that occurred close together, which he described as "[b]oom and then boom."

The witness further testified he walked from the store to the driver's side of his uncle's truck, where the door was open. There, he saw his uncle lying down and a man wearing a hat climbing out of the cab. Jason said the man then walked between the gas pumps and disappeared from his view. At that point, Jason walked around to the passenger side of his uncle's truck, stood on tiptoes, and reached up to open the passenger side door. When he did so, he saw blood and began crying. Afterwards, a woman took him back inside the store and someone telephoned his mother. Jason said he did not see his uncle with any guns or knives that morning and did not see any in the truck. On cross-examination, he testified he had seen his uncle with a machete in the past, and that he did not look under or behind the seat of the truck when he got in it that morning. He also admitted it was hard for him to remember what happened that day.

The next witness's testimony was admitted by stipulation, with the parties agreeing that had Rose Troglin testified, she would have stated the following. She and her husband were selling work clothes next to the Golden Gallon on August 14, 1996, as part of the Highway 127 sale. A man she did not know stopped and bought five pairs of pants and three shirts, and then left and pulled into the Golden Gallon. Five minutes later, she heard a shot and looked toward the Golden Gallon. Four or five seconds later, she heard a second shot and saw the glass shatter and the man fall. A white truck was on its way out of the station, but she did not know if it was involved in the shooting.

Roger Snyder, a patrolman with the City of Dunlap Police Department, testified he was dispatched to the shooting at 10:23 a.m. He was the first officer on the scene, arriving at 10:26 a.m., and immediately secured the crime scene as the ambulance crew began attending to the victim.

Sequatchie County Sheriff's Department Investigator Joe Nipper testified he found the victim lying on his right arm and right chest in the seat of his vehicle, with his head away from the steering wheel and both hands extended. Several items were in the truck: a sack containing work clothes and another sack containing a six-pack of beer with one missing bottle, which were found on the passenger's side floorboard; the missing bottle of beer and a soft drink in a clear bottle which were found under the victim's body after he was removed from the vehicle; two knives which were found on the floorboard; and a machete which was found underneath the vehicle's seat, with the handle visible from the driver's side of the vehicle. One of the two knives found on the floorboard, a two-bladed knife with one of the blades open, was lying at the victim's fingertips on the transmission hump of the vehicle. The other knife, which had a large blade that did not close, was lying on the floorboard under the steering wheel. Investigator Nipper identified the videotape made from the store's surveillance camera, which he testified he obtained from store manager Deanna Sims and subsequently turned over to Larry Davis of the Tennessee Bureau of Investigation ("TBI") for further processing. He also identified the defendant's six-shot, Ruger .357 magnum single-action pistol, which he said he received, along with two spent cartridges and four live rounds, from Marilyn Shaw of the Sequatchie County Sheriff's Department. On cross-examination, Investigator Nipper acknowledged the defendant cried several times and appeared to be upset during his initial conversation with him at the sheriff's department, which occurred early in the afternoon on the day of the shooting.

Dr. Charles Warren Harlan, the pathologist who performed the autopsy of the victim's body, testified he found three gunshot wounds to the victim's body: an entry and an exit wound to the victim's head caused by a bullet which entered above and behind the victim's left ear, passed through his brain, and exited above and in front of his right ear; and one wound to the victim's chest and abdomen caused by a bullet which entered in the left anterior chest region, passed through the victim's heart and liver, and was recovered from the victim's right posterior chest wall. Either of the wounds, alone, would have been fatal to the victim, and Dr. Harlan was unable to determine from the autopsy which wound was inflicted first. The absence of any powder stippling around either wound indicated that both shots were fired from a distance of greater than twenty-four inches. No alcohol or drugs were found in the victim's blood or urine.

TBI Agent Steve Scott, an expert in firearms identification and examination, testified he concluded from his analysis of the gunshot residue on the victim's shirt that the muzzle of the defendant's gun was between twenty-four and forty-eight inches from the victim's shirt when the gunshot to the victim's chest was fired. He further testified that the defendant's gun was a single-action Ruger Blackhawk .357 caliber revolver, which required the hammer to be manually cocked for each shot to be fired.

TBI Special Agent Forensic Scientist Oakley W. McKinney, an expert in fingerprint identification, testified he was unable to detect any latent prints from either of the knives recovered from the floorboard of the victim's truck, and was unable to make a positive identification of a latent print that had been lifted from the vehicle itself.

Marilyn Shaw testified she was a bookkeeper and dispatcher with the Sequatchie County Sheriff's Department, and was working on the morning of August 14, 1996. Five to ten minutes after the dispatches directing emergency workers to the Golden Gallon went out, the defendant and his uncle, David McCarver, came into the sheriff's department. When she asked if she could help them, the defendant looked at her and said, "I am the one that did the shooting. I came to turn myself in. It was self-defense. He pulled a knife." David McCarver then handed her the defendant's pistol. Shaw testified the defendant was wearing a "beige white" cowboy hat at the time and seemed "very calm."

TBI Special Agent Larry Davis testified he received the store surveillance videotape of the shooting, previously identified and marked as Exhibit 5, from Investigator Joe Nipper. After viewing it and realizing that the action was too fast and jerky, he took the videotape to Will Walker, an employee of the Nonprint Services Department of Dupont Library at the University of the South in Sewanee, and asked him to slow the tape down. Walker complied, creating a copy of the surveillance videotape that contained three versions of the incident: the original fast action recorded by the store's surveillance cameras, a slowed-down version, and a yet slower version.[3] Agent Davis testified that nothing was added or deleted from the store's surveillance tape and that the only change Walker made was to slow the action down. He identified a copy of the videotape created by Walker, which was subsequently admitted as Exhibit 27 and played before the jury.

Agent Davis further testified he later took the same original store surveillance tape to Tom Edwards of TREC, Incorporated in Huntsville, Alabama, to have him enhance pertinent portions of the tape, including the gas pump area where the shooting occurred. After he identified the enhanced version of the videotape created by Edwards, it was marked as Exhibit 28 for identification only.

Thomas R. Edwards testified he had a doctorate in physics and was the chief scientist for TREC, Incorporated, a company specializing in forensic video image analysis. He said he had, at

---

[3]Counsel informed the court during pretrial arguments over the admissibility of the enhanced videotapes that the first slowed down version showed the action in approximate "real-time," whereas the second slowed down version showed it in slow motion. From our viewing of the tape, this appears to be an accurate description.

Agent Davis' request, created an enhanced version of the store's surveillance videotape in which he had tried to make the images in the areas of interest pointed out to him by Agent Davis bigger, better, and brighter, so that they would be easier to view and understand. After explaining at some length and in detail the processes he had employed in creating the tape, Dr. Edwards identified Exhibit 28, which had previously been marked for identification only, as the videotape he had made. The tape was then admitted into evidence and played before the jury. At the conclusion of its showing, however, Dr. Edwards announced to the trial court that it was not the videotape he had made. The jury was excused from the courtroom, and the trial court granted a short recess for counsel to investigate what had occurred. When the trial resumed, the district attorney general explained to the trial court, out of the presence of the jury, what had transpired:

> Your Honor, apparently what has happened, I had two copies of the three segment tape that Larry Davis made at Dupont Library, and apparently when I introduced that I inadvertently picked up the wrong tape and handed it to Dr. Edwards. The tape that he actually made, and which the Court has seen, was in a compartment in the trial box, and I found it and it has his case number and date and all that. Dr. Edwards looked at the tape on the video, and it has his front piece on it and said, Yes, this is the tape I created. So what has happened is we have inadvertently, I think, played the tape that Larry Davis had made twice.

After it was established that Exhibit 28 was, in fact, a copy of Exhibit 27, defense counsel moved for a mistrial, arguing that by showing the same videotape twice, undue emphasis had been placed on the videotape, thereby prejudicing the defendant. The trial court denied the motion, opting instead to give a curative instruction to the jury to explain the mistake. The trial court also overruled defense counsel's renewed objection to the introduction of the enhanced version of the videotape created by Dr. Edwards. Thereafter, Dr. Edwards identified his enhanced version of the tape, which was admitted as Exhibit 29 and played before the jury. On cross-examination, Dr. Edwards acknowledged law enforcement officers had pointed out the areas of interest on the videotape. He testified he and his staff, in conjunction with the officers, had exercised their judgment in determining which frames to enhance, as well as which frames to delete from his version of the videotape.

**Defense Proof**

The defendant's first witness was Mina Phelps, who testified she and her sister drove to the defendant's house on the afternoon of August 13, 1996, where they spoke with the defendant's son about whether the defendant, who owned a nursery, would be interested in performing some landscaping at their home. The next day, August 14, the defendant came to her house at about 9:00 a.m. and spent approximately an hour inspecting the grounds and discussing with her the work she wanted performed. After they had reached an agreement regarding the work, the defendant left, and

she did not see him again that day. Phelps said she noticed nothing unusual about the defendant's demeanor that morning.

Carol Ann Confer, who was working in the deli bakery of the Bi-Lo store in Dunlap on August 14, 1996, testified the defendant came into the bakery that day between 9:15 and 10:00 a.m. and ordered a birthday cake for his son. She told him it would take her ten to fifteen minutes to decorate the cake, and he said he would walk around the store and return for it. The defendant returned before she had completed her work, however, and, when he learned the cake was not ready, told her that he might leave the store and come back for it later. Confer said the defendant gave no indication of where he was headed, and she did not see him again that day.

Richard Bryant, the owner of the B Quick Market, testified that the time printed on his store's invoices in August 1996 was Eastern, rather than Central Time. Therefore, the defendant had made his gasoline purchase at the store at 9:16 a.m. Dunlap time on the morning of the shooting.

The defendant's next witness, Dr. Peter Brown, a psychiatrist, testified at length about the defendant's medical history of seizures, triple heart bypass surgery, and medications, and the effect these had on his mental processes. Dr. Brown testified he was employed at Moccasin Bend Mental Health Institute, where he worked both in acute care and on the forensic team, which evaluated individuals charged with crimes to determine their competence to stand trial and their mental states at the time of their offenses. In addition, he worked at Erlanger and Memorial Hospitals in Chattanooga, where he provided psychiatric consultations to patients in the coronary care units, general medical wards, and surgical wards. Dr. Brown said his particular field of interest was in "consultation liaison psychiatry," which he defined as "psychiatric problems that people with medical illnesses have." He testified he had worked in that field since the early 1980's and had recently addressed the Chattanooga Psychiatric Association on the topic of psychiatric problems in patients with cardiac illnesses.

After explaining the function of the human heart, the blockage that can occur to coronary arteries leading to coronary artery disease, and the procedure employed in a coronary bypass, Dr. Brown testified that "significant literature" shows three possible ways in which coronary bypass surgery can affect the brain: (1) the likelihood that a patient who has hardening of the coronary arteries also has hardening in other parts of the body, which may cause brain impairment, as well as damage to other organs; (2) the psychological stress of the surgery itself, which, despite the frequency with which it is performed, remains a major, impressive procedure in which the patient's heart is taken out of his or her chest; and (3) brain injuries resulting from complications arising from the surgery itself.

Dr. Brown testified the defendant's medical records suggested that he "had significant, in addition to cardiac, . . . renal effects and high blood pressure and also hardening of the arteries affecting his brain, and that it was producing symptoms as early as 1993." He also concluded from the defendant's medical history that he was at a higher than average risk of having suffered brain injury as a result of the bypass surgery. Dr. Brown testified fifteen different studies, in the United

States, Canada, and Europe, estimate a bypass patient's likelihood of sustaining brain injury from surgery, ranging in severity from stroke or death to neurological problems, at between 25 and 79%. He said two of the possible causes of brain injury arising from bypass surgery are: (1) blood clots are formed during or after surgery, which can travel to the patient's brain; and (2) the mechanical pump used to circulate the patient's blood during surgery is simply not as efficient as the patient's own heart. According to Dr. Brown, evidence supporting the latter is that "the longer the person is on the pump, the longer the surgery is, the more likely there's to be neurological problems."

Dr. Brown testified a number of factors increase a patient's risk of suffering neurological problems as a result of bypass surgery, including: a history of previous brain damage; high blood pressure; angina or a previous history of heart attack; the length of time in surgery, including how long the patient's heart remains on the pump; complications with the patient's heart rhythm after surgery; and the medications the patient takes after surgery. Of these factors, three were highly significant: a history of previous brain damage; the length of time in surgery; and atrial fibrillation occurring after surgery.

Dr. Brown testified the defendant's medical records revealed he had all three of the most significant risk factors, as well as a number of other risk factors. He said, for a period of six to seven months in 1993, the defendant suffered uncontrollable grand mal seizures involving loss of consciousness. According to Dr. Brown, the severity of the seizures caused the defendant, who had once been a successful businessman, to become "significantly confused and impaired to the extent that . . . he went on disability" and "was no longer able to work." The defendant also had a history of high blood pressure, evidence on his cardiogram of a previous heart attack, and angina on his stress test prior to surgery. In addition, his surgery was significantly longer than the average, and he developed post-operative atrial fibrillation, which lasted approximately three days after surgery. Further risk factors included the defendant's history of high cholesterol, which is associated with impaired cognitive function, and neurological testing performed subsequent to the surgery showed he had significant impairment. Finally, Dr. Brown testified that the number and type of medications the defendant was taking "would significantly suggest that they were also a factor." Based on all these factors, he estimated that, going into the surgery, there was "approximately 95 percent probability that [the defendant] would be a candidate for one of these neurological problems."

Dr. Brown testified that, in addition to reviewing the defendant's medical records, he also interviewed and examined him in order to determine whether his medical treatment and illnesses could have contributed to changes in his mental state. He also referred the defendant to a neuropsychologist, Dr. Tom McClarin, who performed independent neuropsychological testing and evaluation of the defendant. From their separate evaluations and testing, he and Dr. McClarin independently reached the same diagnoses, which was that the defendant had a "cognitive disorder and a mood disorder . . . due to his general medical condition." Dr. Brown explained the term "cognitive disorder" meant "that the overall functioning capacity of [the defendant's] thinking is impaired," and that the term "mood disorder" meant "that the person has significant anxiety and depression that's as a result of the combination of the physical changes in the brain and also related

to the fact that they're having such difficulty with concentration, memory retention and general planning."

Dr. Brown testified that the many medications the defendant was taking, both before and after his heart surgery, would have also had an effect on his cognitive functioning. The defendant was on seven medications: Lanoxin, Metoprolol, Cardizem, Dilantin, Hydrocodone, Nitroglycerin, and aspirin. According to Dr. Brown, any one of these various drugs could cause a variety of side effects, but Lanoxin, Metoprolol, Cardizem, Dilantin, and Hydrocodone, in particular, were known to cause depression and confusion. Dr. Brown testified that "given the probabilities," in his opinion, the defendant was more likely than not suffering from side effects of his medications in August 1996. He explained the basis for his opinion:

> Now, what you have to assess is what's the relative chance of these happening as potential side effects and the way we do that is to try [to] reach an estimate as to what the possibility of combination would be. Now, if we count the number of medications that he has, the number of medications the person is on, and we talk about the possible risks in term of percentage. If a person is on one or two drugs, the risk is probably somewhere in the area of five to 10 percent. If the person is on eight of these medications, then the probability is around 90 percent. So somewhere between these two figures, between two and eight medications, you have a risk of around 45 to 65 percent if you're on five medications. So it's more likely than not that anyone receiving all of these medications would experience these side effects. If a person has preexisting heart disease, the risk is likely to be higher. However, we don't have good numbers to substantiate how much higher that could be.

Dr. Brown testified he would expect the defendant's cognitive impairment to have manifested itself in three different ways in August 1996: first, with problems of reflection, including problems with attention, concentration, memory, especially short-term memory, and organizing and understanding information; second, with problems of judgment, meaning "difficulty in formulating a plan, weighing the consequences, considering alternatives, deciding, and carrying out the plan"; and third, problems with controlling his emotions, which meant the defendant likely would have been impulsive, experienced anxiety and depression, had difficulty estimating threats and a tendency to overreact to stress. Dr. Brown testified that an individual with these types of cognitive impairments, when placed under "extreme emotional pressures, difficulties in a relationship, financial difficulties, confrontations of people, various other kinds of major stresses," would be likely "to have what's known as a catastrophic reaction, meaning that the level of their function suddenly collapses and they decompensate, so they're likely to do far worse the more stressful the situation." The first three months following coronary bypass surgery, he said, was the period in which a patient would experience the maximum amount of difficulty.

Dr. Brown testified on cross-examination that he was licensed to practice psychiatric medicine in Tennessee, but was not board certified by the American Psychiatric Association. However, he had taken the Canadian College examination, which was considered for Tennessee's purposes to be an equivalent examination. He stated he saw the defendant once for a period of two hours. He was unable to render an opinion as to whether the defendant was capable of appreciating the wrongfulness of his actions at the time of the shooting. Finally, he acknowledged it was possible for a coronary bypass patient to bring a stressful situation on himself.

Dr. Tom McClarin testified he was a specialist in neuropsychology, "a speciality field that involves investigating how the brain and [its] functioning affects what people do and how they feel," and had been asked to determine the defendant's level of cognitive functioning or intellectual ability. He first interviewed the defendant and then conducted five hours of extensive face-to-face clinical testing, for a total of "close to six hours" spent with the defendant. He said the defendant's IQ tested at 83, which was in the low average range. Based on what the defendant told him about his background of having run his own nursery business, Dr. McClarin considered the defendant's IQ to be low or below expectancy, which he concluded resulted from his long-standing seizure disorder and bypass surgery. Overall, he said, the defendant showed "very clear cognitive deficits" in his intellectual or problem solving abilities, and fell within the upper range of moderate impairment. The defendant's condition would have been either the same or worse at the time of the shooting; it would not have been better. Dr. McClarin testified the "premorbid estimate calculations" showed the defendant's IQ was previously approximately thirteen points higher, at about 96. He emphasized, however, that this was only an estimate. He said stress would have decreased the defendant's ability to think clearly and make good decisions. The defendant's emotional behavior during testing was "labile," with the defendant fluctuating between periods in which he was clear and conversant, and periods in which he wept and was sad and remorseful. Dr. McClarin acknowledged he did not know if the defendant was under the influence of any narcotic that might have influenced the results of his neurological tests. He did not, however, believe that the defendant had been malingering.

The fifty-one-year-old defendant, testifying in his own behalf, recounted his medical, employment, and social background, previous experiences with the victim, and some of his activities immediately before and after the shooting. He said he married Delilah McCarver when he was nineteen and she was sixteen, and he did not complete high school. He began working in his family's nursery business as a child and eventually started his own wholesale nursery, which he owned and operated for about twenty years until he was forced in 1993 to stop working for health reasons. As a child he contracted rheumatic fever, which caused him to be bedridden for a year and left him with a heart defect. He started having severe seizures in 1993 and had a heart attack sometime later. He began experiencing mental and emotional problems at about the same time, for which he sought help at the Dunlap Mental Health Center. In June of 1996, he underwent heart bypass surgery. Before his surgery, he was taking medication for depression, seizures, and "nerves." After the surgery, he had "a lot of depression," went through "crying spells," and experienced panic attacks, in which he felt confused, depressed, "real scared," and disoriented.

The defendant testified his wife filed for divorce and moved out in 1995, first staying with relatives and then eventually moving in with the victim. However, she occasionally returned to his home to visit, primarily to get money and to attempt to obtain from the defendant the painkiller Hydrocodone, to which she was addicted. The defendant testified he loved his wife at the time of the shooting and had not wanted the divorce to be finalized. He said he still loved her and had been out with her a few times since the shooting. She had dropped the divorce proceedings, but they had no plans to reconcile.

According to the defendant, the first time after his wife left that he had personal contact with the victim was when he spotted his wife's vehicle outside a pawn shop in Pikeville and stopped to talk to her. The victim was with her, and he had a conversation with the victim as well, but no confrontation occurred. Later that day, he followed his wife to the Golden Gallon, and the victim pulled in behind him as he was trying to talk to his wife in the store's parking lot. Although the victim refused to leave him alone to have a private conversation with his wife, no trouble occurred between them then or during their next encounter, which occurred approximately six months later when the defendant again saw the victim with his wife at the Golden Gallon. The defendant testified he knew where the victim lived and was familiar with his Chevrolet car and red Chevrolet truck. He claimed, however, that he did not know about the victim's four-wheel drive truck and had never seen the vehicle prior to the time of the shooting.

The defendant testified he received a number of threats from the victim prior to August 14, 1996. Before he and his wife separated, he heard the victim had bragged he was going to take the defendant's wife and half his money. Later, the defendant heard from his wife that the victim had said he would hurt the defendant if the defendant "messed with" him. The defendant further testified that "a few weeks, a few months" before the shooting, he received a number of telephone calls late at night in which the caller warned him to watch his back and watch which windows he walked in front of because he (the caller) was coming after the defendant. The defendant implied the calls were from the victim. During this interval, he also received two to three hang-up calls per week, which usually occurred in the middle of the day. The defendant stated that his son, as well as another young man who lived at his house, reported receiving threatening phone calls as well. As a result of these threats, the defendant "started being more careful" and "started carrying [his] gun more." As examples of other changes he made to his lifestyle in response to the threats, the defendant cited how he had begun closing the shades and blinds in his house, which had not previously been his habit, and how he had moved the area in which his bookkeeper worked in his home from a desk by the window to the dining room. The defendant testified he was afraid of the victim, at times feared for his life and safety, and, following his heart surgery in June 1996, did not feel physically capable of defending himself.

The defendant also testified he was threatened by the victim's sister, Jewell Steele, and her boyfriend during the encounter she initiated outside the Dunlap restaurant. He said Steele refused to believe his denial of involvement in sugaring the victim's gas tank and threatened what she would do to him if he were responsible. He stated that, as he and Steele were arguing, her boyfriend exited her vehicle and told him he would be "hunting for [the defendant]" if he bothered Steele's son's

vehicle. The defendant denied having made any statement to Steele about not being through with the victim yet.

The defendant described his activities in the hours before the shooting as follows. He went to a doctor's appointment in Chattanooga on August 13, and rested at home when he returned. On August 14, which was his son's birthday, he left home at 9:00 a.m., spent about half an hour at Mrs. Phelps' house discussing her landscaping, and then went to the Bi-Lo grocery to pick up a birthday cake because he had a cookout and birthday party planned for his son later in the day. He had no memory of having gone to the B Quick Market that morning, although he acknowledged he regularly traded there, as well as at the Golden Gallon. He said that when the Bi-Lo employees informed him of the wait before his cake would be ready, he told them he would return for it later. He then left the store and drove north through town "killing time," before stopping at the Golden Gallon to get some gasoline. The defendant said he did not stop at J & J Complete Car Care on his way to the Golden Gallon, did not see the victim anywhere along his drive, and did not know the victim was in town.

The defendant testified he pulled his truck up to the first pump island at the Golden Gallon, paused for a few moments while he searched his wallet for the proper credit card and reviewed notes he had made while at Mrs. Phelps' house, and then pulled away to turn his truck around and approach the gas pumps from the other side, having become confused about which side of his truck his gas tank was on, and mistakenly believing he had pulled in from the wrong direction. While turning his truck around, he was delayed by traffic congestion and by someone asking him for directions. Since the first two pumps were occupied when he came back around, he pulled into the first empty spot at a different island, where another vehicle was parked on the opposite side. Hearing someone at that vehicle call his name, he got out of his truck and stepped across the island to see what the person wanted. He recognized the victim only after he heard him start to threaten him about his wife. At the same time, he saw the victim's door open and assumed he was coming after him. He also assumed the victim was armed, as his wife had told him the victim was in the habit of carrying a gun. Therefore, the defendant said, he returned to his own vehicle and retrieved his pistol.

The defendant's memory of subsequent events was sketchy. He said he had no memory of going back to the victim's truck, no memory of shooting him, and no memory of returning to his own truck and leaving the gasoline station. His next memory was of driving through town and seeing blue lights flashing as police cars passed him. He said he remembered seeing his uncle standing on the sidewalk and stopping to pick him up, but had no memory of driving to the sheriff's department. However, he did remember walking into the jail and telling a woman inside he was involved in the situation she was listening to on the radio. He did not remember having said anything else. He could not explain why he had not simply left the service station upon returning to his truck after being confronted by the victim, but speculated he must have panicked when he saw the victim coming out of his truck. He said he had no plan or intent to kill the victim that day.

On cross-examination, the defendant acknowledged the victim did not directly threaten him in the weeks before the shooting. He denied he had made harassing telephone calls to the victim. The defendant disagreed the store surveillance videotape showed he initially pulled directly up to

the Golden Gallon building rather than stopping at the gas pumps, and denied he had been parked right outside the building, as the store manager had testified. He agreed the videotape showed he had started toward pump three at the same time the victim exited the store, but denied that he had seen the victim at that point. He said he never called the victim's name. He testified the victim never got out of his vehicle, he did not see him with a gun, and he did not remember having told the detectives otherwise. He did not recall having leaned over into the victim's truck after the shots were fired and denied having planted a knife in the victim's vehicle. He also denied having told his uncle that he had taken care of "that son-of-a-bitch Harvey." He did not know if, at the time he shot the victim, he had thought the victim was about to kill him.

William McCarver, Jr., testified he was thirty years old and the son of the defendant and Delilah McCarver. He said his mother's filing for divorce hurt and depressed the defendant, but the defendant never showed any bitterness toward her and never expressed any anger toward the victim. McCarver testified the defendant's severe seizures caused him to become easily fatigued and have difficulty remembering things, and his heart surgery left him "[v]ery weak" and depressed.

McCarver testified he personally answered several harassing telephone calls, including hang-up calls and two threatening messages, while staying at the defendant's home before the shooting. During the first threatening call, which occurred late at night two or three months before the defendant's surgery, the caller said, "Ricky Harvey is going to take your family." During the second call, which occurred not long after the first, the caller said something to the effect of "You better be careful where you walk in front of your curtains and tell your children to be careful where they walk in front of the curtains." The defendant reacted to the threats by pulling and pinning the drapes closed and moving the bookkeeper's work area away from the window. McCarver testified he immediately went to the jail after hearing about the shooting. When the defendant saw him, he broke into tears, slid down the wall to the floor, and sat and cried for several minutes without saying a word.

On cross-examination, McCarver testified he was never able to identify the voices of the anonymous telephone callers. He acknowledged that about a month after the shooting, a crew from the family's nursery business performed the landscaping job at Mrs. Phelps' house using the estimate that the defendant had prepared the morning of the shooting. He testified on redirect that he did not recognize either of the two knives that were found on the floorboard of the victim's truck.

Don Whittenberg testified he was friends with William McCarver, Jr., had known the defendant since he was fifteen, and lived in the defendant's home. He corroborated the previous two witnesses' testimony regarding the decline in the defendant's health and the depression he had suffered following his heart surgery. He also corroborated their accounts of the harassing telephone calls that had been made to the defendant's house prior to the shooting. Whittenberg said approximately three weeks before the defendant's heart surgery, he answered the telephone at about 1:30 a.m. to hear someone say, "Watch your back. I'm coming after you." Because he was not aware of anyone else with whom the defendant was having problems at that time, he assumed the caller was the victim. Whittenberg said he informed the defendant of the telephone call.

Whittenberg further testified he answered the telephone at about 4:00 p.m approximately one week after the defendant's surgery, to have the caller, who identified himself as the victim, tell him to inform the defendant that he did not appreciate him sugaring his gas tank. Whittenberg said he responded by telling the caller that the defendant had just gotten home from the hospital following heart surgery, to which the caller replied, "Well, you tell him I can play games, too." Whittenberg testified he informed the defendant of this telephone call as well. The defendant responded to the threatening telephone calls, as well as the repeat hang-up phone calls that occurred three to four nights per week, by closing the curtains and moving his office area away from the window. Whittenberg said he was not familiar with the knives found on the floorboard of the victim's truck.

The defendant's daughter, Debrina McCarver, testified as follows. The defendant was depressed at the departure of his wife, the witness's mother, but still loved her. She never heard the defendant express any anger or bitterness toward the victim. The defendant's health deteriorated beginning in 1993. He became depressed and forgetful and began experiencing panic attacks. She did not receive any threatening telephone calls herself, but was present at the defendant's home when others did and relayed the messages to the defendant. The defendant reacted by closing curtains and moving his work area away from the windows. She arrived in Dunlap from Nashville at about 2:00 p.m. on the day of the shooting and went straight to the jail to see the defendant, where she found him crying, confused, remorseful, and in shock.

R. Fredrick Harding testified he taught physics and chemistry at White County High School in Sparta and was the pastor of the Church of God of Prophecy on Highway 30 in Spencer. He was married to a sister of Delilah McCarver, and had known the defendant for twenty-four years. He noticed a change in the defendant's personality around 1993, with the defendant seeming to be "more placid," "[n]ot so spontaneous," and not the same "bouncy person" he used to be. The defendant became a regular attendee of his church around the time of his heart surgery, and attended church services on the Sunday before the shooting.

Inez Smith testified she had a part-time bookkeeping business and had worked as often as three to four days per month at the defendant's home handling the bookkeeping associated with his nursery. Approximately two months before the shooting, she noticed that the drapes in the home were kept closed and her work area had been moved from the desk in front of the bay window to the dining room. On cross-examination, she acknowledged that the defendant's drapes had remained closed since the victim's death and that the business's papers were still kept on the dining room table.

After deliberating, the jury found the defendant guilty of first degree premeditated murder, and the trial court subsequently sentenced him to life imprisonment. Following the denial of his motion for a new trial, the defendant filed a timely appeal to this court, raising four issues which he states as follows:

> I.    Did the court err in not granting a judgment of acquittal as to the indicted offense of first degree murder in that the State's proof was

insufficient to show that the killing of the deceased was the intentional and premeditated act of the defendant in that the defendant was unable to form the requisite intent due to his diminished capacity?

II.  Was the verdict of the jury in this case against the weight of the evidence and did the evidence preponderate against the verdict of first degree murder?

III.  Did the court commit prejudicial and reversible error in admitting into evidence enhanced and altered videotapes from the Golden Gallon security camera which inaccurately had gaps and spaces in time and which were enhanced to show only selected portions of the recording?

IV.  Did the court commit prejudicial and reversible error in giving its jury instruction as to the word intentional by giving said instruction in the disjunctive form and in a manner which authorized a conviction based only upon an awareness of the nature of the conduct and not the result of conduct?

## ANALYSIS

### I. Sufficiency of the Evidence

As his first two issues, the defendant argues the trial court erred in denying his motion for judgment of acquittal at the conclusion of the State's proof, and that the evidence was insufficient to support the jury's verdict finding him guilty of first degree murder. Since "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction," State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000), we will address the defendant's first two issues together as a challenge to the sufficiency of the evidence.

When the sufficiency of the convicting evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App.

1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant contends the State failed to prove the requisite element of premeditation to support his first degree murder conviction and that the evidence, at most, supports a conviction for second degree murder. Although he argued both self-defense and diminished capacity at trial, he focuses on appeal on the evidence he presented as to his diminished capacity, arguing that he proved he suffered from a diminished capacity "so severe as to negate the premeditation required for first-degree murder." In support, he cites, *inter alia*, his expert witnesses' testimony regarding his neurological problems and impaired cognitive functioning. The State responds by arguing the evidence was sufficient to support the defendant's conviction and that it was within the jury's province to disbelieve that the defendant's mental and physical problems rose to the level to negate the element of premeditation. We agree with the State.

For the purposes of this case, first degree murder is "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation is defined as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d).

-19-

In Tennessee, once a homicide is established it is presumed to be second degree murder and the State bears the burden of proving the element of premeditation to elevate the offense to first degree murder. See State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999); State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). Whether premeditation exists is a question for the jury to determine based on the evidence, and may be established by the defendant's conduct and the circumstances surrounding the killing. See State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Our courts have listed a number of facts from which premeditation may be inferred, including evidence of a motive for the killing, evidence that the defendant procured a weapon, use of a deadly weapon upon an unarmed victim, infliction of multiple wounds, and evidence of the defendant's calmness immediately following the killing. See State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000); State v. Dellinger, 79 S.W.3d 458, 492 (Tenn. 2002); Bland, 958 S.W.2d at 660.

Viewed in the light most favorable to the State, the evidence was more than adequate to establish that the defendant's killing of the victim was intentional and premeditated. As for the defendant's motive, the victim had been having an affair with the defendant's wife and had been openly living with her for several months prior to the shooting. The defendant admitted at trial that he had been unhappy about the separation, still loved his wife, and had not wanted the divorce to become final. Approximately four weeks before the shooting, the victim's sister had a confrontation with the defendant in which he denied having sugared the victim's gas tank, but also stated that he was not through with the victim yet. On the morning of the shooting, Jeff Turner was having a conversation with the victim outside his automotive repair shop when he saw a distinctive, late model, extended cab white Ford pickup truck with a bug deflector, a vehicle that looked like the defendant's, pull off the highway and sit for a moment behind the victim's vehicle before pulling back onto the highway and heading north in the direction of the Golden Gallon. Although Turner acknowledged he could not be sure, he testified he thought the defendant was the driver.

Golden Gallon store manager Deanna Sims witnessed the defendant pull his pickup truck up to the store building, where he sat for a few minutes before reversing out of the parking spot and then pulling up to the island at which the victim's vehicle was parked. Sims saw the defendant open his door and assumed he was getting gasoline. However, the proof established that the defendant had already purchased 9.5 gallons of gasoline for that same vehicle at the B Quick Market at 9:16 that morning. Moreover, the store surveillance tape shows that the defendant began moving from his parking spot to the pump island only after the victim had exited the store and started walking back to his vehicle.

The defendant fired two shots at the victim, one of which went through his brain and the other of which struck him in the heart and liver. Immediately before the first shot was fired, Michael Scoggins heard the defendant call out the victim's name. He then saw the defendant step up onto the pump island and lean over toward the victim's vehicle before the second shot was fired. Two other eyewitnesses, Jeff Sutherland and Marian Lance, also saw the defendant lean toward the victim's vehicle, with Sutherland corroborating Scoggins' testimony that the defendant stepped up onto the pump island before the second shot was fired, and Lance testifying that she saw the defendant reach his arm almost inside the victim's vehicle before firing the second shot. A number

of witnesses testified that there was an interval of several seconds between the two shots, and the TBI firearms expert testified that the murder weapon was a six-shot, single action pistol that required the hammer to be manually cocked before each successive shot could be fired.

According to Jeff Sutherland, the defendant appeared calm immediately after the shooting, returning to his vehicle, putting something under the seat, and unhurriedly driving from the gasoline station toward town. The defendant also appeared calm upon his arrival at the sheriff's department, stating to sheriff's department employee Marilyn Shaw that he was the one responsible for the shooting and had acted in self-defense after the victim pulled a knife on him. However, none of the eyewitnesses saw or heard the victim threaten the defendant, and the defendant himself admitted the victim never got out of his vehicle. He also admitted that the victim did not have a gun. Further, he testified he had no memory of the victim's having a knife or of having claimed self-defense in his statement to Shaw. The victim's sister testified that the victim was not in the habit of carrying a knife on his person, and she did not recognize either of the two knives recovered from his vehicle. Finally, the victim's nephew testified he did not see any knives on the victim's person or in the truck on the morning of the shooting, but he saw the defendant climbing out of the cab of the victim's truck immediately after the shooting.

From all of this evidence, the jury could have reasonably concluded the defendant formed the intent to kill the victim because of his affair with his wife, armed himself with a pistol in order to carry out his plan, stalked the victim through town, watched until he saw him return without his nephew to his vehicle, and then took the opportunity presented by driving over to the pump island, calling the victim's name, and shooting him through the brain and heart to kill him. The jury could have further reasonably concluded that the defendant planted the knives found in the victim's truck in order to support a claim of self-defense.

The defendant argues, nonetheless, that the "uncontroverted and unimpeached testimony from" his "highly qualified expert witnesses, taken together with the testimony of the lay witnesses demonstrates" that he was suffering from diminished capacity at the time of the offense, such as to make him incapable of acting with "a significant degree of coolness and deliberation required in order to commit the offense of premeditated first-degree murder." We respectfully disagree. The concept of diminished capacity recognizes that a defendant may present expert, psychiatric testimony "'aimed at negating the requisite culpable mental state'" of an offense. State v. Perry, 13 S.W.3d 724, 734 (Tenn. Crim. App. 1999) (quoting State v. Hall, 958 S.W.2d 679, 688 (Tenn. 1997)). "While diminished capacity is not an excuse or justification for committing the offense, it contemplates an acquittal of the indicted offense and a conviction for a lesser included offense." Id. (citing Hall, 958 S.W.2d at 688).

In arguing that the evidence does not support his conviction, the defendant stresses his expert witnesses' testimony regarding his mental limitations, which he asserts proves he lacked the capacity for premeditation, and the fact that the State put on no expert psychiatric or psychological witnesses of its own. However, as the State points out, the jury was not required to accept the defendant's expert testimony to the exclusion of the other evidence presented in the case. See State v. Nesbit,

978 S.W.2d 872, 886 (Tenn. 1998); State v. Holder, 15 S.W.3d 905, 912 (Tenn. Crim. App. 1999). Although Dr. Brown testified at great length about the defendant's medical history and the likelihood of his having suffered neurological damage as the result of his heart surgery, as well as the probability that he was experiencing side effects from his many medications, there was substantial proof that the defendant was able to function normally in his daily life, including proof of his having successfully estimated a landscaping job for a customer of the family's nursery business on the very morning the shooting occurred. And even if the jurors accepted the defendant's experts' testimony that the defendant had a cognitive disorder and a mood disorder that resulted in a lowering of his IQ and difficulties with his concentration, memory, and control of emotions, they nonetheless could have reasonably concluded from the evidence that the defendant's mental and physical problems did not prevent him from premeditating the victim's murder. Therefore, after viewing the evidence in the light most favorable to the State, we conclude it was sufficient for a rational trier of fact to find the defendant guilty of first degree premeditated murder beyond a reasonable doubt.

## II. Admissibility of Enhanced Videotapes

As his next issue, the defendant contends the trial court committed reversible error by admitting into evidence the enhanced versions of the store's surveillance videotape. Relative to weighing probative value against prejudice or the potential for prejudice, the admissibility of evidence rests within the discretion of the trial court. See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). An abuse of discretion appears when the trial court applied an incorrect legal standard, or where the trial court's ruling is against logic or reasoning and causes an injustice to the complaining party. See State v. James, 81 S.W.3d 751, 760 (Tenn. 2002).

The defendant argued in a pretrial motion that the altered and enhanced versions of the store surveillance videotape should be excluded as unfairly prejudicial. He asserted that Will Walker's slowed down version gave a distorted picture of the time frame involved in the incident, and that the alterations involved in the creation of Dr. Edwards' version created inaccurate and unfair depictions of the crime scene and the activities of the defendant at the time of the shooting. After viewing the tapes, the trial court ruled them admissible provided the State first laid the foundation for their admission:

> I'm ruling, for the record, that the State will have to lay the foundation and an explanation, but I'm ever [sic] bit satisfied that the jury's got as much common sense as I've got in understanding what's being done and that that explanation can be given to the jury and you can cross-examine him on that point if you think it's a distortion, and they can draw their own judgments and conclusions from that.

The defendant renewed his objections to the videotapes at several points during the trial. Each time, the trial court overruled his objection, reiterating its belief that the jury had the common sense to

understand the State's expert's testimony regarding the changes that had been made to the original surveillance tape.[4]

We find no abuse of discretion by the trial court in this matter. Agent Davis clearly explained to the jury that the only changes Walker had made to the tape was to slow the action down, and that the tape Walker had created contained three versions of the incident: the original scenes as recorded by the store surveillance tape in fast action and the two slower versions. As for the second enhanced tape, Dr. Edwards provided a lengthy explanation to the jury of the necessity for creating an enhanced version and of the processes employed in its creation, including his slowing down of the action and enlargement of certain scenes and deletion of others. He testified the surveillance tape recorded images at the rate of one frame per second, whereas images on regular video are recorded at the rate of thirty frames per second, which meant that the surveillance tape, when put into a regular VCR, played thirty times faster than normal. He explained:

> The regular TV that you're looking at is expecting 30 frames a second. This is one frame a second, so it's going 30 times faster, so it comes in front of your face like a speeding train, and to try to digest that, well, you can't do it. We don't have the ability, as people, to. It's just all nonsense. So that's why you go through all this processing. You slow it down, you look at the individual frames, you do all sorts of things to it to try to make sense out of it. If you just played it on a regular K-Mart special, or Wal-Mart, or whatever, VCR it's just right past your face. You just can't make sense out of it. It's very hard to, let's put it that way.

When asked if there were scenes on the original surveillance tape that did not appear on his enhanced version, Dr. Edwards replied:

> Sure. That's the whole idea. We can't take every image that comes off the tape. There's just too many of them, thousands of them. So what we do is we go into, especially in the process tape where we take into the computer, we just go into those areas of interest and if there's something occurring here, we'll take those and put them in the computer, enhance them and here, here, here, or here. So we don't pay attention to what doesn't seem to be related to the

---

[4]The defendant asserts in his brief that the trial court at one point had second thoughts about allowing Dr. Edwards' enhanced version of the videotape into evidence, and that it expressed concern that doing so would constitute "overreaching." However, a close reading of the transcript reveals that the court's statement was actually made in response to the State's inquiry as to whether Dr. Edwards would be allowed to explain the enhanced version of the videotape to the jury as it was being played. The trial court initially ruled that he could, but only after the tape had first been played in full without interruption. Upon further reflection, however, the trial court reversed itself, stating that it did not want to create a situation in which it was "picking out a particular piece of evidence and allowing it to be given more emphasis than other pieces of evidence."

incident that's happening. So you'll see a time stamp of this time and maybe another time stamp some time later. Then you see a whole section where the time stamps are kind of like one after the other, after the other[,] after the other. Then you may see a gap that may have a time stamp here and a time stamp there.

As his direct examination testimony continued, Dr. Edwards explained other processes he had used in the creation of the enhanced version of the videotape:

Q    Did you, in creating this tape, blow up certain – that may be a bad word, but enlarge certain segments of it?

A    We like to go back to the three little concepts, bigger, better and brighter. We have the ability to make these enlargements. That's one of the features of our technology so that it looks like it's been enlarged by a lenses [sic], and yes, we did go in and make certain frames enlarged so we can see better what was occurring in the areas of interest.

Q    And do they appear, these enlargements appear on the tape that you produced?

A    Yeah, they're interspersed. You'll see a regular frame that's maybe been intensity enhanced and brightened up and maybe time based corrected some electronics correcting, and then you may see right after that an enlarged version of a region of interest, and then maybe another one of the regular and then an enlarged version, and those were the files that we actually abstracted and put into the computer and processed and made the tape. We can make a tape of all those processed images, which we have right here.

Further, Dr. Edwards testified that the law enforcement officers had pointed out to him the areas of interest on the tape and agreed on cross-examination that he and his staff had, in conjunction with the officers, exercised their judgment in deciding which scenes to enhance.

The defendant cites two cases from other jurisdictions in support of his argument that the enhanced videotapes should not have been admitted into evidence because of their distorting effects. However, we agree with the State that the situations presented by both cases are readily distinguishable from that of the present appeal. In Powell v. Indus. Comm'n of Arizona, 418 P.2d 602, 610 (Ariz. Ct. App. 1966), rev'd on other grounds, 423 P.2d 348 (Ariz. 1967), the Arizona Court of Appeals ruled that a "speeded up" motion picture should not have been admitted in a workers' compensation case because it unfairly portrayed the claimant as having worked at a faster rate of speed than had been the actual case. Similarly, in Utley v. Heckinger, 362 S.W.2d 13, 17

(Ark. 1962), a case involving a collision between an automobile, a wrecker, and a truck, the Arkansas Supreme Court concluded that the jury should not have been shown a portion of a motion picture which appeared to depict the automobile driver as walking faster than she had actually walked.

By contrast, there was no danger in the present appeal that the enhanced videotapes would mislead the jury about the speed at which the events occurred. The jury heard Dr. Edwards' testimony regarding the manner in which the store surveillance tape recorded the action, and the reason for his changes to the video. The jury also saw the fast action recorded on the original surveillance tape. In addition, it was able to see the time counter on the enhanced versions of the tape, which showed the exact time, including minutes and seconds, at which each event occurred. Thus, the jury was fully apprised of the time line involved in the incident.

The defendant also contends that the inadvertent repeat showing of Will Walker's version of the surveillance tape further compounded the prejudice created by the videotapes, and should have resulted in a mistrial. We respectfully disagree. Whether or not to declare a mistrial lies within the sound discretion of the trial court, and we will not disturb the court's decision absent a clear showing of abuse of discretion. State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App.), perm. to appeal denied (Tenn. 2000) (citations omitted). A mistrial should be declared in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared. See id. (citing State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994)); State v. Jones, 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999) (citing Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977)). "Generally, a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting Arnold, 563 S.W.2d at 794). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. Land, 34 S.W.3d at 527 (citing State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)).

We find no abuse of discretion by the trial court for failing to declare a mistrial as a result of the mistake with the videotapes. The record reveals that the trial court provided a thorough and detailed curative instruction to the jury, explaining the situation and instructing the jury not to place any significance on the fact that the videotape had been repeated:

> Ladies and gentlemen, at the conclusion of the trial, I'm going to tell you when you retire to the jury room that you're allowed [to] take and use your common sense when you get into the jury room. What's occurred here, common sense is applicable to, we made a mistake. We played the tape that Mr. Davis played for you the first time, the second time. It was not the tape that was produced by Mr. Edwards simply because someone picked up the wrong tape and put it in the machine. So you viewed Mr. Davis' tape twice.

Now, normally, in the trial of a case I try not to let people repeat things, questions, various things, and there's some reasons behind that. The first thing that comes to mind is we kind of like to move trials along if we can, and the more we duplicate and waste your time, it's to the detriment of everyone involved. Another reason is we don't want to emphasize one particular piece of evidence over another piece of evidence. We want you folks to have the opportunity to weigh evidence yourself and it's not the prerogative of a judge to in any way comment on evidence. But in this situation you have seen this tape twice, and I want you to understand that fact. I'll allow the attorneys to make whatever arguments they want to in that regard, and they'll have an opportunity in their closing arguments, if they wish to comment, to comment on it.

And I want to say something else at this point, so something is abundantly clear to you, because I've given you this explanation of what's gone on I want to emphasize that I am not in any way attempting to or suggesting to you what your decision regarding the facts of this case should be. I'm not in any way attempting to inject myself into that process. That is not my prerogative. You are the sole and exclusive judges of the facts of this case. I gave you that explanation so that you could understand we're all human beings and when we deal with human beings mistakes get made and a mistake happened here.

In summary, we conclude that the trial court did not abuse its discretion either in allowing the enhanced videotapes into evidence or in refusing to declare a mistrial upon the inadvertent repeat showing of the first altered videotape.

### III. Jury Instructions

As his final issue, the defendant contends the trial court gave erroneous jury instructions as to the culpable mental states for first and second degree murder, thereby lessening the State's burden of proof. The trial court instructed the jury as follows with respect to first degree murder:

For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) that the defendant unlawfully killed the alleged victim; and

(2) that the defendant acted intentionally. A person acts intentionally with respect to the nature of the conduct or to a result of

-26-

the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result; and

(3) that the killing was premeditated.

A premeditated act is one done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It's not necessary that the purpose to kill preexisted in the mind of the accused for any definite period of time. It is sufficient that it preceded the act, however short the interval, as long as it was the result of reflection and judgment. The mental state of the accused at the time he allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation. If the design to kill was formed with premeditation, it's immaterial that the accused may have been in a state of passion or excitement when the design was carried into effect. Furthermore, premeditation can be found if the decision to kill is first formed during the heat of passion, but the accused commits the act after the passion has subsided.

The trial court's instruction on second degree murder included the following definition of knowingly:

Knowingly means that a person acts knowingly with respect to the conduct or to the circumstances surrounding the conduct when the person is aware of the nature of the conduct, or that the circumstances exist. A person acts knowingly with respect to a result to the person's conduct when the person is aware that the conduct is reasonably certain to cause the results.

The defendant cites State v. Page, 81 S.W.3d 781 (Tenn. Crim. App. 2002), to argue that because first and second degree murder are result-of-conduct offenses, the trial court erred by including the statutory definition for intentionally that relates to nature-of-conduct offenses and the statutory definition of knowingly that relates to the defendant's awareness of the nature of his conduct and the circumstances surrounding the conduct. The State concedes the trial court should have limited the instructions on intentionally and knowingly to the definitions applicable to result-of-conduct offenses, but submits the defendant waived the issue by failing to raise the specific objection he raises on appeal at trial or in his motion for new trial. In the alterative, the State contends the error was harmless beyond a reasonable doubt because the jury's finding of premeditation necessarily included a finding that the defendant was aware of the result of his conduct at the time he acted.

The defendant did not object to the trial court's definition of knowingly at trial, and did not specifically base his objection to the definition of intentionally on its inclusion of the nature-of-conduct language. However, the definition he proposed as an alternative to the statutory definition of intentionally did contain a statement that intent involved the defendant's mind being fully aware of the nature *and* the consequences of his act. Thus, we disagree with the State that he has waived the issue for appellate review.

However, we agree with the State that the error in jury instructions in this case constituted harmless error. In <u>Page</u>, a juvenile defendant was tried as an adult and convicted of second degree murder for causing the death of the victim by striking him in the head with a baseball bat. <u>Id.</u> at 782. On appeal, this court concluded that because second degree murder is a result-of-conduct offense, the trial court erred by including the nature-of-conduct and nature-of-circumstances definitions of knowingly in its instructions to the jury and, further, the error was not harmless because the defendant's trial defense had been that he was intoxicated and unable to appreciate the consequences of his conduct at the time he acted. <u>Id.</u> at 789-90. Here, by contrast, the jury convicted the defendant of the premeditated murder of the victim. As we have stated in a recent case:

> Implicit in a finding of premeditation is that it was the defendant's desire to cause the result of his conduct, i.e. the death of the victim. Because the jury determined that the defendant acted with the design to kill, it is our view that the inclusion of the nature-of-conduct definition of intentional would be harmless beyond a reasonable doubt.

<u>State v. Duane Brian Brooks</u>, No. E2002-02040-CCA-R3-CD, 2003 WL 21554551, at *5 (Tenn. Crim. App. July 10, 2003) (citing <u>State v. Antoinette Hill</u>, No. E2001-02524-CCA-R3-CD, 2002 WL 31780718 (Tenn. Crim. App. Dec. 13, 2002)). We further concluded in <u>Brooks</u> that any error in the trial court's definition of knowingly would be harmless beyond a reasonable doubt in a case in which the jury has convicted the defendant of premeditated murder, as "a finding of premeditation encompasses a finding that the defendant acted knowingly." <u>Id.</u>

We therefore conclude that although the trial court erred in its jury instructions on intentionally and knowingly, the jury's verdict finding the defendant guilty of the premeditated murder of the victim renders the error harmless beyond a reasonable doubt.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE